[L. A. No. 995.    In Bank.—December 18, 1902.]

## GERMAN SAVINGS AND LOAN SOCIETY, Appellant, v. ADOLPH RAMISH et al., Respondents.

STREET BOND ACT—CONSTITUTIONAL LAW—PRIOR MORTGAGE.—The bond lien provided for in the Street Bond Act of March 9, 1893, is intended to be prior to all other liens; and that act is not unconstitutional, as impairing the obligation of a prior mortgage; nor is it in violation of the fourteenth amendment to the federal constitution, which is inapplicable in tax proceedings.

ID.—OPPORTUNITY FOR HEARING.—The fact that the Street Bond Act, which gives the lot-owner an opportunity to object to the issuance of the bond, but does not in terms give the right to object to lienholders, does not make the statute void.

ID.—LONG PERIOD OF BONDS—TAXING POWER.—The power conferred upon the council by the Street Bond Act to impose a charge upon the property-owners for a period of ten years is a proper exercise of the taxing power, and is not a taking of private property for public use.

ID.—CONSTITUTIONALITY OF VROOMAN ACT—AMENDMENTS.—The Vrooman Act is constitutional; and none of the amendments thereto are invalid.

ID.—CHANGE OF GRADE ACT — PROVISION FOR HEARING — DAMAGES— WAIVER.—The Change of Grade Act, which is not intended to include the original establishment of grade, sufficiently provides for notice and hearing on the question of damages by all persons entitled to compensation under the constitution before the actual damage occurs, to be paid when the grade-lines are changed, provided a petition is made for damages. Those who do not ask damages may be deemed to have waived them.

ID.—STATUTORY CONSTRUCTION—ORDINANCE TO CHANGE GRADE.—The Vrooman Act and the Change of Grade Act are to be treated as *in pari materia;* and the power to pass an ordinance to change or modify the grade of a street exists under both acts, and may be referred to either.

ID.—PROCEEDINGS TO IMPROVE STREET AFTER CHANGE OF GRADE.—Proceedings to grade, gravel, and otherwise improve a street, inaugurated by another ordinance, after a change of official grade has been made under the Change of Grade Act, are not invalid because not complying with that act.

ID.—SUFFICIENCY OF PETITION—DETERMINATION BY COUNCIL.—A petition presented by a majority in frontage of lot-owners, asking both for a change of grade, and also that after such change an order be made to grade and improve the streets to the new grade, and to issue

serial bonds therefor, is sufficient to confer power upon the council not only to change the grade, but also to order the improvements petitioned for. An ordinance of intention to grade and otherwise improve the street is conclusive that, at its passage, the persons whose names appeared upon the petition were owners of a majority of the frontage.

ID.—ASSESSMENT DISTRICT.—The council may establish the assessment district either so as to be coincident with and include only the lots which would have been assessed under the front-foot mode of assessment, if such mode had been adopted, or it may include a district other than that.

ID.—STREET BOND ACT NOT REPEALED.—The Street Bond Act was not repealed by the constitutional amendment of 1896 to section 6 of article XI of the constitution. That amendment did not give life to the scheme for street improvements in the charter of Los Angeles which were void under section 8 of article XI of the constitution.

ID.—CONTRACT FOR REDUCED RATE—PRIVILEGE OF PROPERTY-OWNERS—FRAUD NOT SHOWN.—Where three fourths of the property-owners, instead of electing to do the work at the price awarded, made a contract with the contractor for a reduced rate, and a corresponding credit on their assessments, the privilege of entering into which was extended to all other lot-owners, such contract carries no such evidence of fraud as to warrant the court in declaring the bonds void.

ID.—DESCRIPTION OF ASSESSMENT DISTRICT—CERTAINTY.—A description of an assessment district which would have been sufficiently certain in a conveyance is sufficiently certain under the law.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. W. F. Fitzgerald, Judge.

The facts are stated in the opinion of the court rendered in Department Two.

J. S. Chapman, for Appellant.

Frank G. Finlayson, for Respondents.

THE COURT.—For the reasons given in the opinion delivered in this case in Department the judgment and order appealed from are affirmed.

Van Dyke, J., Garoutte, J., McFarland, J., Henshaw, J.

The following is the opinion rendered in Department Two, on the third day of April, 1902:—

CHIPMAN, C.—Statement of the facts.  Lots 1 to 11, block 15, in the city of Los Angeles, on January 8, 1890, belonged to W. D. Gould and wife, and on that day were mortgaged to plaintiff; the mortgage was subsequently foreclosed, and plaintiff became the purchaser at foreclosure sale after all the proceedings relating to the assessment and sale of the property had taken place.  On November 11, 1895, the owners of a majority of the feet frontage, and also owners of a majority of the property affected by the proposed change of grade, filed a petition with the council, in which they prayed for "the change and establishment of the grade of said streets [here follows description, subsequently followed by the council]; also stating that the grade should be changed and established at the same time, for the mutual benefit of the public and all parties in interest, and that the district which will be benefited . . . is the property fronting thereon [here follows a description of the district as given subsequently in the ordinance 3638]; also that when the grade has been changed and established as prayed for, that the council "will order said streets, and each of them, to be graded, graveled, guttered, curbed and granite cross-walked to the said new and established grade," (the description here follows and is the same as was afterwards set forth in the ordinance 3638); also that if the cost is found to be greater than one dollar per front foot on each line of street, the council "will determine that serial bonds be issued to represent the cost of said work and improvement, in the manner and form provided by law; also praying that the council establish and declare the district to be benefited by said grading, . . . and to be assessed to pay the *total costs and expenses thereof*" (here follows description of the proposed district as appearing later in said ordinance 3638); also praying that the assessment be "at a uniform rate per square foot over the entire district," and representing that "the public interests demand that the same be expedited and *completed rapidly, and that the same is of more than* local and ordinary benefit."  Plaintiff did not sign this petition nor did it appear in any of the subsequent proceedings, but the Goulds signed the petition.  On November 18, 1895, the city council, in accordance with said petition, duly passed an ordinance (No. 2313) of intention to change the grade of the street described in the petition, on which the

improvements in question were afterwards made. No objection was filed to the proposed change of grade within thirty days from the publication of said ordinance, except by one Mitchell and one Nollack, and no other persons filed any claim or petition showing ownership of any property claimed to be damaged by said proposed change of grade. The mayor, city engineer, and superintendent of streets assumed to act as a board of commissioners, provided for in section 3 of the act of March 9, 1893, though no record appears of their appointment as such board, but it appears that each of these commissioners made affidavit in the matter of the change of grade of the streets mentioned in ordinance 2313, reciting that the council having referred to them the claims of Mitchell and Nollack, they, said commissioners, would "make the estimate of benefits and damages incurred by such change of grade as in said ordinance proposed, to the best of his ability. They reported to the council April 11, 1896, . . . we find that the benefits that accrue to said property are in excess of any damages incurred by virtue of said change in grade." Notice was given by the clerk of the filing of their report as required by law and a day fixed therein for all persons to show cause why it should not be confirmed; no objections being made except by Mitchell and Nollack, a day was fixed to hear their objections, and on the day fixed for such hearing, to wit, May 25, 1896, the objections were denied and the report of the commissioners confirmed. Neither plaintiff nor the Goulds made any objection to any of the proceedings. On May 25, 1896, the council changed the grades of these streets, by ordinance No. 3620, under the provisions of the Change of Grade Act of March 9, 1893, (Stats. 1893, p. 89). On January 8, 1896, the council, by an ordinance of intention No. 3638, under the Street Bond Act of February 27, 1893, (Stats. 1893, p. 33,) commenced proceedings to grade, gravel, gutter, cross-walk, and curb the streets in question; and deeming the work of more than local or of ordinary public benefit, the council declared by this ordinance that the intention was to make the expense of said work chargeable upon an assessment district, declaring the same to be the district benefited by the proposed improvement, and to be assessed to pay its cost, according to the district plan and not by the front-foot method of assessment. Other facts appear in the opinion.

This is an action to enjoin defendant Hartwell, city treas-urer of the city of Los Angeles, from executing a deed to defendant Holliday to all of the lots in block 15, of the Woolen Mill Tract in said city, being lots 1 to 11, inclusive, the only property affected by this action. These lots were sold because of the non-payment of certain bonds which had been issued for street improvement pursuant to the Street-Bond Act (Stats. 1893, p. 33). The cause was tried by the court on the pleadings and an agreed statement of facts. Plaintiff appeals from the judgment in favor of defendants and from the order denying plaintiff's motion for a new trial.

1. Plaintiff contends that if the bond act is to be given a retrospective effect it impairs the obligation of Gould and wife to plaintiff and violates the constitution of the United States.

Whether the power to tax for street improvements is to be referred to the general taxing power and the power of emi-nent domain, or, as some courts have suggested, to the police power, is not very important. Whatever its source may be, it exists beyond question by reason of its nature and objects, and that it partakes of the nature of the taxing power must be admitted. The power to levy a tax for general purposes, which shall be a lien superior to all other liens, prior or other-wise, is not doubted, and it is not because it is called a tax, but because of its object and the necessity for raising revenue in order to execute the functions of government. In modern times, whatever may have been the demands of society in an earlier period of the development of government, the neces-sity for improving the streets of cities and towns, while per-haps less important in degree than the general objects of gov-ernment, is yet important and necessary to the welfare of the whole community, and in our opinion the principles on which the system of general taxation depends, and which govern in the enforcement of tax levies for general purposes, are also applicable to taxation for the improvement of streets, the construction of sewers, and other like public work. It is a mistaken assumption that the improvement of a particular street in a city is solely for the benefit of adjoining property-owners; the benefit accrues to the public generally, and the power to compel such improvements is essential to the well-

being of communities. The bond act expressly provides that the lien of the bonds shall be "a first lien upon property" (Stats. 1893, sec. 4, p. 36); and section 5 also makes the provisions of the law for the collection of delinquent state and county taxes applicable to sales under the bond act. (Pol. Code, sec. 3788.) The intention seems to be clearly manifested that the bond lien shall be prior to all liens. The view we take of the statute makes it unnecessary to inquire as to the effect of the lien which attaches upon the recording of the warrant. If we are to protect prior mortgages against the lien, how can we in reason take from the owner his title, which antedates the mortgagee's interest?

In *Murphy* v. *Beard*, 138 Ind. 560, at page 565, the question of the priority of the assessment lien was involved and the court said: "If, however, we are correct in the proposition that a purchaser takes title with the implied paramount right of the public for the uses named, the lienor takes his mortgage and makes his own loan with notice of that paramount right, and must submit to its exercise." (*Wabash etc. Ry. Co.* v. *Commissioners etc.*, 134 Ill. 384 at p. 400; see, also, the principle discussed in *California Loan etc. Co.* v. *Weis,* 118 Cal. 489.)

2. It is next contended that the act is in violation of the fourteenth amendment to the federal constitution. Plaintiff insists upon this point, notwithstanding this court in *Hadley* v. *Dague*, 130 Cal. 207, has held adversely to this contention. We are not disposed to reopen this question. *Hadley* v. *Dague* was adhered to in *San Francisco Paving Co.* v. *Bates,* 134 Cal. 39.

3. Plaintiff claims that all the acts, in so far as they undertake to provide for the issuance of bonds, are void as against plaintiff, for the reason that they do not offer any opportunity to it to be heard in the proceeding. The assessments are payable and become liens upon the recording of the warrant, assessment, diagram, and certificate of the city engineer. (Vrooman Act, secs. 9 and 10, Stats. 1885, p. 155.) Thenceforward all persons have notice by the recordation of these documents, and the assessment may be paid at any time thereafter. (*Ibid.*) The statute provides that the bond shall not issue until after the expiration of thirty days from the date of the warrant. (Bond Act, sec. 4, Stats. 1893, p. 34.)

The bond creates no new liability, and in effect provides for what by some would be regarded as more favorable payment, because in installments and after a period of years. However this may be, the lot-owner cannot complain, since he may pay the assessment and prevent the issuance of the bond. But the act does give the lot-owner an opportunity to object to the issuance of the bond; and that the person so objecting must file a certain affidavit accompanied by a certificate cannot be said to take away the right given to object. And because this right to object is not in terms given to lienholders does not, in our opinion, make the statute void. (See on the subject. *Hellman* v. *Shoulters,* 114 Cal. 136.) If a mortgagee can be heard to complain, so could a leasehold-owner or any other person having any interest, however slight, present or prospective. It would be difficult to frame an act that would escape appellant's objection.

It is urged also that no sufficient hearing is accorded by the act of March 9, 1893, the Change of Grade Act, because no hearing is given upon the question of establishing or changing the grade,—i. e. a paper grade,—and yet damage may result at some time from such grade; also that although section 2 of the Vrooman Act of 1885 gives the council power to establish and change the grades of streets, no provision is made for any notice before the grade is established; that the Change of Grade Act only gives to an owner or person owning property an opportunity to be heard upon the question of damage or benefit, and does not give the mortgagee any opportunity to be heard whether there is damage or benefit arising from changing or establishing grade lines, and even the owner has no opportunity to be heard as to benefits or damages where the grade is first established, and hence the act is void. The fourteenth amendment of the federal constitution cannot be invoked, because it is inapplicable in tax-proceeding cases. (*Merchants' Transportation Co.* v. *Chicago,* 99 U. S. 635; *Reardon* v. *San Francisco,* 66 Cal. 492.[1]) If any damage can be claimed, it must be by reason of our state constitution requiring such notice and hearing. It was said in *Paulson* v. *City of Portland,* 149 U. S. 30 (at p. 38) : "While not questioning that notice to the taxpayer in some form must be given before an assessment for the construction of a sewer

---

[1] 56 Am. Rep. 109.

can be sustained, . . . we do not think it essential to the
validity of a section in the charter of a city granting power
to construct sewers that there should in terms be expressed
either the necessity for or the time or manner of notice''; and
it was held that where the power is given to do the work the
statute would not be unconstitutional if it did not require
that any notice be given; notice must be given, but ''the city
would have a broad discretion with reference to the kind of
notice and the manner of giving the same,'' quoting *Gilmore*
v. *Hentig,* 33 Kan. 156. (See, also, *Lent* v. *Tillson,* 72 Cal.
404.)   The consequential damages arising directly from a
change of grade may be compensated only by reason of the
provisions of the state constitution, or some law passed pur-
suant to the constitution.   The constitutional provision is:
''Private property shall not be taken or damaged for public
use without just compensation having been first made, or
paid into court for the owner.''   A mortgagee is entitled to
compensation, if at all, because of this provision of the consti-
tution, and if he object that the Change of Grade Act pro-
vides only for the filing of a petition for damages by the
owner, then he must seek compensation as an owner; and if
he claims that the word ''owner'' does not include a mort-
gagee, *Lent* v. *Tillson* replies to him that the statute and the
constitution must be read together as one law, and the statute
is as broad as the constitution.   It may well be asked at this
point, May compensation for the same damage be awarded
to both the owner and mortgagee?   Certainly not.   If to but
one, which one?   And if one damage to both, how to be appor-
tioned?   And why the necessity for providing notice to others
than the owner?   But the act does make ample provision
for a notice to and a hearing by such persons as come within
the description of those entitled to compensation, and this
we think relieves the statute from appellant's objection.   It
may be true, as contended, that where the statute fails to
provide a time of payment for damages arising from chan-
ging a grade the damages are payable at the time they accrue,—
i. e. when the grading is begun; but the Change of Grade Act
of 1893 has provided that the compensation may be deter-
mined before the actual damage occurs, and shall be paid
when the grade lines are changed; lot-owners who do not then
petition for compensation, as the statute provides, shall be

deemed to have waived them. This was the rule under the old constitution (*In re Beale Street*, 39 Cal. 495); and the rule is not changed where, as now, compensation is made for property "damaged," which could be demanded under the old constitution where "taken." The property-owner may waive all claim to compensation (*Bigelow* v. *Ballerino*, 111 Cal. 559); and those who do not ask damages may be deemed to have intentionally waived them.

We do not think appellant is sustained in assuming that the Change of Grade Act is broad enough to include the original establishment of grades, as well as the change of established grades. Counsel thus assumes and claims that the act does not give any one an opportunity to be heard upon the question of damages and benefits where the grade is first established. Section 1 (Stats. 1893, p. 89) empowers the city council "to change or modify the grade of any public street . . . and to regrade or repave the same, so as to conform to such modified grade, in the manner as hereinafter provided." This language implies the existence of a previous grade. Under the Vrooman Act the council had power to establish as well as change the grade of streets, and, treating all these statutes as *in pari ·materia,* counsel for respondents answers, we think with reason, that it was because of the provision of the Vrooman Act that section 1 of the Change of Grade Act provided that "no change of an *established* grade shall be ordered except on petition of the owners of a majority of the property affected." We do not think it was intended by the Change of Grade Act of 1893 to grant power to originally establish a grade; such power comes from other acts. Besides, as counsel further shows, if, as is alleged in the complaint, ordinance No. 3620 did change the grade of these streets, the power of the council to pass the ordinance may be referred to the Vrooman Act; and if the ordinance did not have the effect to change the grade of these streets, they remained as originally established, and the true grade lines, wherever they may be, were the grade lines as originally established. We must construe the ordinance of intention as intending to grade the streets to the proper official grade lines (*Emery* v. *San Francisco Gas Co.,* 28 Cal. 346, at p. 376); and there having been no appeal to the council by the parties interested from the acceptance of the work by the

city engineer, which the Vrooman Act, by section 11, provided might be taken, the act of the superintendent was conclusive that the streets were graded to the true official grade. (*Warren* v. *Riddle,* 106 Cal. 352.) And the Street Bond Act makes the bonds conclusive evidence as to matters not essential to the jurisdiction of the officers to create the assessment. (Stats. 1893, p. 36; *Ramish* v. *Hartwell,* 126 Cal. 443.)

5. Assuming that the Vrooman Act of 1885 is unconstitutional in that it provides for front-foot assessments, appellant contends that all subsequent acts amendatory thereof are necessarily unconstitutional because a void statute cannot be amended. Appellant's premise being unsound (*Hadley* v. *Dague,* 130 Cal. 207), the conclusion is equally faulty.

6. It is claimed that the proceedings to grade, gravel, etc., are void because they did not comply with the statute of March 9, 1893, (Change of Grade Act): 1. Because the commissioners did not assess the benefits or damages upon each lot within the district; 2. That no petition was filed by the owners of a majority of the lot frontage; and 3. The district included no lots or land except such as would have been assessed had the front-foot method been adopted.

We have already held that this act only authorizes the council to regrade, repave, etc., and not to grade, pave, etc., originally, this latter authority being derived from other statutes. The improvements of the streets in question were initiated by petition, in which the Goulds joined, which substantially asked to have everything done which was subsequently done in the matter. It does not follow that because the petition was broad enough to include the grading, graveling, etc., of the streets, that what the council did, under ordinance 3638, after the grade was established, was done under the Change of Grade Act. It does appear that the commissioners acted on the petitions of Mitchell and Nollack, who were the only ones who claimed any damage in the matter of changing the grade, and their report was confirmed by the council. Their petition was filed during the proceedings to change the grade, and we do not think the act required the commissioners to assess any benefits and damages for which no petition was presented to them. If there were other lot-owners entitled to have the question of benefit and damages

determined by the commissioners, it was their duty to present their petitions therefor, and not having done so, their claims must be deemed to have been waived. The assessment liens would not be void because of any failure to first provide compensation to the lot-owner. The power of taxation, unlike that of eminent domain, may be exercised although damages have not been paid to the owner before the street work is done. (*Hornung* v. *McCarthy*, 126 Cal. 17; *De Baker* v. *Southern Cal. Railway Co.*, 106 Cal. 260.[1]) The act of March 9, 1893, was amended by the act of March 11, 1893, (Stats. 1893, p. 172,) by which latter act a petition by the owners of a majority of the feet fronting thereon is made a condition precedent to the grading, regrading, etc., of any street; and appellant claims that no such petition was filed, unless the petition of November 18, 1895, meets the requirements, which appellant denies. Aside from the fact that there is no allegation in the complaint that there was no such petition filed, and that it may be presumed that there was a petition, and aside from the further claim of respondent that, in view of the conclusive evidence clause of the bond act (Stats. 1893, p. 36), such a petition is not jurisdictional in the sense that it is a necessary prerequisite to a valid assessment, we think the petition filed by a majority of the lot-owners, the Goulds among them, was sufficient to meet the requirements of the amendatory act relied on by appellant. The suggestion that the signers of the petition on November 18, 1895, may not have been lot-owners when the council afterwards passed ordinance No. 3638, is met by the counter-suggestion that it was part of the duty of the council to determine whether the signers were then lot-owners, and this duty we must presume was performed; and the ordinance of intention to grade, etc., is itself conclusive that at its passage the persons whose names appeared on the petition were owners of a majority of the frontage. (*Spaulding* v. *Homestead Assn.*, 87 Cal. 40; *Farmers & M. Bank* v. *Dinsmore*, 97 Cal. 318; *People* v. *Los Angeles*, 133 Cal. 338.) To the point that the council had no authority to declare that the assessment district should be coincident with or include only the lots which would have been assessed under the front-foot mode of assessment, it may be replied that section 3 of the act of 1891, amendatory of the

---

[1] 46 Am. St. Rep. 237.

act of 1885, does not mean that the council must necessarily impose the expense of the improvement upon a district other than a district embracing the lots fronting on the streets to be improved. It may do so, and it may make the district coextensive with the lots which would be liable under the front-foot method, if such mode had been adopted. The statute provides that lot-owners may object to the extent of the district, and thus arrest the proceedings if successful. The council may, however, again proceed, omitting the lots found improperly included. (Section 3, *supra.*) Counsel for respondents points out that at least one lot was included in the district that is three blocks away from Beaudry Avenue, for the grading and improving of which this lot became liable for a part of the cost.

That the method pursued was to plaintiff's pecuniary advantage appears from the undisputed fact that the assessment against its lots was less than one third of what the cost would have been to it had the front-foot mode been adopted.

7. The act under which these proceedings were taken and bonds issued was not repealed by the constitutional amendment of 1896 (art. XI, sec. 6) of the constitution. Appellant relies on *Byrne* v. *Drain,* 127 Cal. 663. The scheme for street improvements provided by the city charter was, when adopted, inconsistent with the general laws then in force, or is inconsistent with general laws subsequently passed and prior to the amendment of 1896, and hence such charter provisions are void because of section 8 of article XI of the constitution; and it has recently been held, in *Banaz* v. *Smith,* 133 Cal. 102, that the amendment of 1896 "did not give life to such provisions." Section 3 (Stats. 1893, p. 34,) does not require the resolution of intention and notice of street-work to state that a bond will issue for each assessment over fifty dollars. A notice to this effect must be given in the warrant, and was so given. Plaintiff admits that the ordinance of intention and the notice of street-work did give a description of the bonds and the rate of interest, and this is all the act required to be there stated as to the bonds; and there was a reference to the bonds in the advertisement for bids.

8. After the city council had awarded to Ramish & Marsh the contract to do the work, the contractors entered into an agreement with the owners of more than three fourths of the

frontage of the lots fronting on the streets to be improved, by which, in consideration of the lot-owners waiving their right to do the work, the contractors agreed to execute the contract with the superintendent to perform the work awarded to them and allow the lot-owners a credit of twenty-five per cent on their assessments, provided they paid to the contractors the balance, seventy-five per cent in cash, within thirty days after the making and filing of the assessment by the superintendent of streets. It was also provided that the lot-owners might elect to have bonds issue under the act, in which case they were to have fifteen per cent credit indorsed on the bonds. It was also provided that any lot-owner not signing the agreement might within thirty days from posting of notice of the award become a party to the contract; and after the issuing of the assessment the contractors offered to receive from Gould and wife seventy-five per cent of the assessments against the lots in block 15, in full settlement against said lots. The allegations of fraud in the complaint were denied, and the only facts agreed upon as to this transaction are as above stated,— i. e. are to be found in the agreement itself. If there was fraud in the contract, it must be judged alone from its terms. The award had already been made, and alleged fraudulent combination between the lot-owners and the contractors could not have influenced the council in making the award. By the act of 1891 (p. 200) three fourths of the property-owners might elect within ten days after notice of the award to do the work at the price awarded. But if, instead of making the contract complained of, they had elected to do the work, the assessment on the property would have been no less. We fail to see how the other property-owners were injured, especially as they had an opportunity to avail themselves of the contract. Besides, how could this plaintiff as mortgagee be injuriously affected because the Goulds, its mortgagors, did not become a party to the obnoxious contract? It might be inferred that there was too great profit in a contract which would justify the contractors to enter into such an agreement. But on the face of it the contract carries no such evidence of fraud as would warrant the court in declaring the bonds to be void. In one sense it was an acknowledgment by three fourths of the lot-owners that the contract was fairly and duly entered into, and the recitals in the contract say as much.

9. Plaintiff insists that the legislative attempt to confer power on the council to impose a charge upon the property of owners in a city to continue for the period of ten years is not the exercise of the taxing power, but is a taking of property for a public use without compensation and without due process of law. The point we think is shown to be untenable in *Hellman* v. *Shoulters*, 114 Cal. 140.

10. It is contended that the finding that the lots in block 15 were benefited in excess of the damages by more than the amount of the assessment is not justified by the evidence. Respondents' counsel contends that this is a finding upon a wholly immaterial issue; and because of a recent decision, in *White* v. *City of Tacoma,* 109 Fed. Rep. 32, holding otherwise, counsel urges a decision on the point for the reason that a cloud has been thrown over these street-assessment bonds by this decision. We think there was evidence sufficient to support the finding, and this makes it unnecessary to pass upon the question.

11. It is claimed that the district is so indefinitely described that the attempt to create it is void. The alleged defect in the description relates to calls from a point on the north line of Sixth Street, "easterly to the northwest corner of the Galpin tract; . . . thence easterly along the northerly line of said tract and the prolongation thereof to the easterly line of Sixth Street." Some distance before Sixth Street (which runs nearly east and west) reaches Beaudry Avenue, as shown on the diagram, it makes a slight bend southerly, and shortly after passing Beaudry Avenue it makes nearly a right angle, running southerly, the easterly side of the street joining the Woolen Mill tract at the northwest corner of the Galpin tract as we understand the diagram. The controversy arises over the fact whether Sixth Street, running east and west, can have an east line. This southerly arm of Sixth Street, as marked on the diagram, was once Loomis Street, but the name of this part of Loomis Street was changed by ordinance duly passed and published before the proceedings to grade, gravel, etc., were commenced. As shown on the diagram, so did Sixth Street appear on the maps of the city which were published and sold to residents of the city some months prior to the commencement of said proceedings. Clearly the diagram shows an easterly line of Sixth Street at the particular point named.

Without stating further the evidence and the situation as to the contention of appellant, we think the description was sufficiently certain; it would have been a sufficient description in a conveyance, and the law requires no greater certainty. (*Irrigation Dist.* v. *De Lappe,* 79 Cal. 351; *Thomason* v. *Cuneo,* 119 Cal. 25.)

It is advised that the judgment and order be affirmed.

Cooper, C., and Gray, C., concurred.