[Civ. No. 2939. Third Appellate District.—November 18, 1925.]

## OLD HOMESTEAD BAKERY, INC. (a Corporation), Appellant, v. W. H. MARSH, as Chief of Division of Motor Vehicles, Respondent.

[1] MOTOR VEHICLE ACT—TAXATION—EQUITY OF BURDEN—DUTY OF LEGISLATURE.—It was the duty of the legislature, in the framing of a system for the raising of revenue for the purpose of defraying the expense of keeping in repair roads already improved and to contribute to the construction of new roads, to adopt a basis therefor which would have the effect of equalizing, as nearly as may be practicable, the burden thus imposed upon motor vehicles or the owners and operators thereof, considering the particular use to which such vehicles are put, their weight, and such other elements as might properly enter into the determination of the probable effect, as to the matter of "wear and tear," the use of each of the various classes of motor vehicles would have upon the roads.

[2] STATUTORY CONSTRUCTION—STATUTES IN PARI MATERIA—LEGISLATIVE INTENT.—The doctrine of *in pari materia* is not limited to the ascertainment of the meaning of ambiguous words in a particular statute of several dealing with the same general subject, but may be resorted to for the purpose of obtaining light upon the question whether it was the legislative intent that the several statutes should together constitute a single plan or scheme for the accomplishment of a particular object.

[3] ID.—CONSTRUCTION OF RELATED ACTS—POLICY AND PURPOSE OF LEGISLATURE.—Statutes *in pari materia* are those which relate to the same person or thing, or to the same class of persons or things; and in the construction of a particular statute, or in the interpretation of any of its provisions, all acts relating to the same subject, or having the same general purpose, should be read in connection with it, as together constituting one law. The endeavor should be made, by tracing the history of legislation on the subject, to ascertain the uniform and consistent purpose of the legislature, or to discover how the policy of the legislature with reference to the subject matter has been changed or modified from time to time; and it is proper to consider, not only acts passed at the same session of the legislature, but also acts passed at prior and subsequent sessions, and even those which have been repealed.

2. See 23 Cal. Jur. 786; 25 R. C. L. 1061.
3. See 23 Cal. Jur. 787; 25 R. C. L. 1067.

[4] ID.—CONSTRUCTION OF TAX MEASURES—RELATED ACTS—PRESUMP-
TIONS.—The rule that statutes *in pari materia* should be con-
strued together applies with peculiar force to statutes passed at
the same session of the legislature; and it is to be presumed
that such acts are imbued with the same spirit and actuated
by the same policy, and they are to be construed together as
if parts of the same act, and should be so construed, if possible,
as to harmonize, and force and effect should be given to the
provisions of each; and particularly in the construction of stat-
utes relating to revenue and taxation is such rule applicable
and invariably invoked upon the theory that all such statutes
constitute one law.

[5] ID.—UNCERTAINTY—CONSTRUCTION OF ACTS IN PARI MATERIA—
LEGISLATIVE INTENT.—The office of the rule of *in pari materia*
is that of interpretation and of construction; and if, in order
properly to construe a statute, words used therein are of such
dubious or uncertain meaning that the real legislative intent of
the act cannot be determined, when it is considered by itself
or alone, then other statutes, or acts upon the same subject, or
the history of the legislation thereon, may and should be
considered if, by that course, the meaning of the words as in-
tended by the legislature may be learned, and if so learned, thus
open the way for a construction of the statute in accord with
the intent at the bottom thereof.

[6] ID. — CONSTITUTIONAL LAW — HARMONIZING STATUTES IN PARI
MATERIA.—Where a legislative act contains no uncertain or mis-
guiding words, but taken alone, although the subject matter
thereof be within legislative cognizance, it would offend certain
restrictions or inhibitions of the state or federal constitution,
then if there be any other statute or statutes *in pari materia*
with such act, the several acts or statutes should be construed
together as if they constitute but one law, if, in so doing,
they harmonize in the achievement of the central purpose of
their enactment and at the same time remain within the com-
mands or inhibitions of the state and federal constitutions.

[7] MOTOR VEHICLE ACT — TAXATION — STATUTES IN PARI MATERIA—
CLASSIFICATION OF VEHICLES.—The two acts of the legislature
of 1923 (Stats. 1923, pp. 517 and 571), in so far as they pro-
vide, respectively, for a registration fee for electric motor vehicles
and the excise or privilege tax on gas for gas-propelled motor
vehicles were intended to constitute a single plan or scheme
for compelling persons operating or causing to be operated
motor vehicles upon the public highways of the state to pay
a fee or a tax, according to the character of such vehicles,
as to the method of their propulsion, and the two acts in

---

4. See 23 Cal. Jur. 786; 25 R. C. L. 1062.

that particular are *in pari materia* and, in effect, constitute one law.

[8] Id.—Classification of Motor Vehicles—Discrimination—Presumption—Evidence.—In considering the question of discrimination as between said two classes of vehicles, the presumption is that the legislature fully investigated the facts upon which it acted in fixing a flat fee in the one case and a fuel gas tax in the other and in placing the fee for electric motor vehicles used for freight or passenger transportation at fifty dollars, and the statutes themselves constitute a finding that the system established by those acts will bring about as near an equitable adjustment as is practicable, as between the operators of the two classes of motor vehicles so used, of the amounts they should respectively pay for the privilege of using the highways.

[9] Id.—Constitutional Restrictions—Obedience by Legislature—Review by Courts.—The courts cannot go behind legislative enactments which, upon their face, are in complete harmony with the constitution, and, by a resort to evidence, attempt to ascertain whether the legislature, in passing them, did or did not observe or remain within the restrictions which the constitution has placed upon its power as a co-ordinate branch of the government or has or has not properly performed the duty which is not only enjoined upon it by the constitution but which its members by their oaths bound themselves properly to perform.

[10] Id.—General and Uniform Laws—Constitutional Law—Permissible Classification of Motor Vehicles.—The fixing of the privilege tax upon persons operating motor vehicles for the transportation of passengers for hire or of property according to the essential difference in the instrumentalities by which the two kinds of such vehicles so used are operated or propelled is founded upon a classification which has the effect of removing the two acts of the legislature of 1923 (Stats. 1923, pp. 517 and 571), in so far as they provide for a flat fee in the one case and fuel gas tax in the other, from the interdiction of article I, section 11, of the constitution, which provides that all laws of a general nature shall have a uniform operation.

[11] Id. — Constitutional Classification — Uniform Operation of Laws.—While a law cannot be general and uniform in its operation, within the meaning and intent of article I, section 11, of the constitution, if it confers particular privileges or imposes peculiar disabilities or burdensome conditions, in the exercise of a common right, upon a class of persons arbitrarily selected

---

8.   See 5 **Cal. Jur.** 830.

9.   See 5 **Cal. Jur.** 631.

11.   See 5 **Cal. Jur.** 826.

from the general body of those who stand in precisely the same relation to the subject of the law, a law is general and uniform in its operation, within the meaning of said constitutional interdiction, if it operates uniformly upon all persons standing in the same relation to the law in respect to the privileges and immunities conferred by it or the acts which it prohibits.

[12] ID.—CLASSIFICATION OF MOTOR VEHICLES—TAXATION—CONSTITUTIONAL LAW.—That portion of the fourteenth amendment to the federal constitution prohibiting the making or enforcement of any law which shall abridge the privileges or immunities of citizens of the United States, or which shall deprive any person of life, liberty or property without due process of law, or denies to any person within its jurisdiction the equal protection of the laws, is not offended by the two acts of the legislature of 1923 (Stats. 1923, pp. 517 and 571) compelling persons operating or causing to be operated motor vehicles upon the public highways of the state to pay a tax or fee, according to the character of such vehicles as to the method of their propulsion.

---

(1) 29 C. J., p. 583, n. 58.   (2) 36 Cyc., p. 1147, n. 30.   (3) 31 C. J., p. 358, n. 84, 85; 36 Cyc., p. 1147, n. 27, 28, 29, 30, 31, 32; p. 1149, n. 33, 34, 36, 37.   (4) 36 Cyc., p. 1147, n. 30, p. 1148, n. 31, p. 1151, n. 47, 48, 49, 50, 51.   (5) 36 Cyc., p. 1150, n. 45. (6) 36 Cyc., p. 1151, n. 50.   (7) 36 Cyc., p. 1151, n. 51.   (8) 12 C. J., p. 791, n. 19, p. 799, n. 66; 36 Cyc., p. 1135, n. 14.   (9) 12 C. J., p. 787, n. 87, 90, p. 799, n. 62; 36 Cyc., p. 1115, n. 2.   (10) 12 C. J., p. 1151, n. 58, p. 1152, n. 65; 37 Cyc., p. 746, n. 77, p. 747, n. 78.   (11) 12 C. J., p. 1145, n. 5, 6, p. 1147, n. 9, 11, p. 1148, n. 15; 37 Cyc., p. 747, n. 79.   (12) 37 Cyc., p. 747, n. 78.

APPEAL from a judgment of the Superior Court of Sacramento County. Peter J. Shields, Judge. Affirmed.

The facts are stated in the opinion of the court.

Harding & Monroe for Appellant.

U. S. Webb, Attorney-General, and Robert T. McKisick, Deputy Attorney-General, for Respondent.

HART, J.—It appears from the petition, filed originally in the court below, that the petitioner, a corporation, with its principal place of business in the city and county of San Francisco, is engaged in the business of baking bread and certain kinds of confections, and that, in the delivery of its products to its customers, in said city and county, uses the

motor vehicles propelled by electricity; that, on the sixth day of February, 1924, petitioner filed, in due legal form, an application for the registration of a certain motor vehicle so propelled, of which it was the legal owner, and which was designed to be used for the purposes above stated; that, accompanying said application was "the certificate of a public weigher of the State of California, showing the weight of said vehicle, when unladen, to be 6,280 pounds." The petition proceeds:

"That since the date of the payment of the 1923 license tax on said electric motor vehicle, the unladen weight thereof had been increased by improvements made thereon from 5,940 pounds to 6,280 pounds, and that said respondent demanded an additional weight fee of six and 25/100 ($6.25) dollars for the year 1923.

"That at the time of the presentation of said application to said respondent, this petitioner did tender to him, as such, in lawful money of the United States, the sum of thirty-nine and 25/100 ($39.25) dollars, being and including:

"(1) The sum of six and 25/100 (6.25) dollars as and for the additional weight tax claimed for the year 1923, and (2) the sum of three ($3) dollars required to be paid under subdivision (a) of section 77 of said act, and (3) the sum of thirty (30) dollars required to be paid as a weight tax under subdivision (c) of section 77 of said act, and this petitioner did thereupon request and demand that said respondent, out of said sum of thirty-nine and 25/100 dollars ($39.25) so tendered, accept and receive the sum of thirty-three dollars ($33) as payment in full as and for the legal registration fees for said vehicle, for the year or twelve months expiring on the 31st day of January, 1925, and did request and demand that he register said vehicle and assign to it a number, and issue to this petitioner the certficates of registration and ownership provided for in section 41 of said act, and to furnish it with two number plates for said vehicle as provided by section 42 of said act.

"That said respondent did, at said time, refuse, and ever since has refused, to accept said sum of thirty-three ($33) dollars so tendered to him as aforesaid, and did refuse, and ever since has refused, to accept said application and to register said vehicle and to assign to it a number, and to

issue to petitioner the certificates provided for in section 41 of said act, and to furnish it with said number plates, except upon the payment of the additional sum or fee of fifty ($50) dollars mentioned in subdivision (b) of said section 77 of said act as an additional registration fee 'to be paid for the registration of every electric motor vehicle designed and used for the transportation of passengers for hire, or for the transportation of property.' "

The prayer of the petition is for a writ of mandate directed to the respondent to compel him, upon the tender to him of the said sum of $39.25, to "accept, out of said sum, the sum of $33.00 as payment in full as and for the legal registration fee for said vehicle for the year or twelve months ending January 31, 1925," etc.

The respondent interposed a demurrer to the petition on the general ground, and the same was sustained and the proceedings for the writ dismissed. From the judgment entered upon said order the petitioner appeals, upon the judgment-roll alone.

The purpose of this proceeding is to obtain a judicial determination of the question whether the provision of the state Motor Vehicle Act authorizing the imposition of a registration fee of fifty dollars for the registration of electric motor vehicles intended for use and used for the transportation of passengers for hire or the transportation of property, is or is not, when measured by certain mandates of the state and federal constitutions, a valid enactment. The position here of the petitioner is that it is in violation of the state constitution, in that it imposes upon such motor vehicles a fee "in excess of that imposed upon any other automotive vehicles designed and used for the transportation of passengers for hire, or for the transportation of property," and is, therefore, discriminatory; that it is "based upon an unreasonable and arbitrary classification."

The provision to which the objections above stated are here interposed is in subdivision (b) of section 77 of the act of the legislature of 1923 (Stats. 1923, p. 517 et seq.), the object of which, generally stated, is to regulate the use and operation of vehicles upon the public highways, and to provide for the registration and identification of motor vehicles, etc., and for the payment of registration fees therefor. Said subdivision reads:

"(b) A registration fee of ten dollars shall be paid for the registration of every electric passenger motor vehicle and a registration fee of fifty dollars shall be paid for the registration of every electric motor vehicle designed and used for the transportation of passengers for hire or for the transportation of property. Such fees shall be in addition to the fees specified in subdivision (a) of this section."

The preceding subdivision (a) provides for the payment of a registration fee of three dollars for the registration of every motor vehicle, trailer or semi-trailer, except for such as are by the act expressly exempted from the operation of said subdivision.

The act of 1923 was intended to supersede the statute of 1913 (Stats. 1913, p. 639), which provided, in elaborate detail, rules and regulations governing the use and operation of motor vehicles over and upon the public highways of the state. Under said act, registration fees for all motor vehicles, regardless of the kind of power by which they were operated, were rated upon the basis of the horse-power of the vehicle, and, therefore, the amount of such fee which was required to be paid was according to the horse-power of the vehicle. That act, with some amendments thereto by subsequent legislatures, remained the law until the passage of the act of 1923, above mentioned. Among the several changes made in the act of 1913 was that by the legislature of 1915 (Stats. 1915, pp. 397, 401), whereby motor vehicles operated by electricity were, as to registration fees, removed from the general class of motor vehicles and set off in a class by themselves, or, in other words, the electric motor vehicles were taken from the horse-power basis for the charging of registration fees and the owners thereof required to pay for each such vehicle a flat registration fee of five dollars. The gas vehicles were still retained by said act in their original class for registration fee-rating purposes—that is to say, they were still subject to the horse-power system of rating the registration fees.

[1] Of course, the purpose of the legislation exacting license taxes for motor vehicles operated over the public highways is to raise funds with which such highways may be improved and kept in repair in such manner as is suitable to the mode of transportation peculiar to motor vehicles. The theory of such a tax, particularly under present-day condi-

tions as to the character of the highways required and the great expense in constructing and maintaining them is, manifestly, that it is only just and proper that those who use the public highways, either for business purposes or for pleasure, should bear the expense of keeping in repair those already improved and to contribute to the construction of new roads. And, unquestionably, it was and is the duty of the legislature, in the framing of a system for the raising of revenue for that purpose, to adopt a basis therefor which would have the effect of equalizing, as nearly as may be practicable, the burden thus imposed upon motor vehicles or the owners and operators thereof, considering, of course, the particular use to which such vehicles are put, their weight, and such other elements as might properly enter into the determination of the probable effect, as to the matter of "wear and tear," the use of each of the various classes of motor vehicles would have upon the roads. The legislature of 1913, and subsequent legislatures until the legislature of 1923, conceived, as we have seen, that the horsepower standard of rating registration fees would constitute a system which would bring about a just distribution among all classes of motor vehicles of the burden of raising the revenue necessary for road improvement and repair purposes. It may be that that system worked well for just equalization of the burden imposed upon owners of motor vehicles to contribute to the improvement and maintenance of the public roads of the state. As to this, however, we express no definite opinion, nor is it necessary to do so here. Assuming, though, that the system established by the legislature of 1913 at least equitably distributed the burden referred to, there was still another element in the establishment of a scheme for raising revenue for road purposes by a registration fee system which it was necessary to take into account, namely: The raising of a sufficient aggregate annual sum for that purpose to meet the exigent requirements of modern highway improvement and maintenance. It is known, as a matter of current knowledge, that, within the past few years, automotive highway traffic has increased in volume in prodigious and, it may not inappropriately be added, in alarming proportions. The expense of maintaining the public highways, from the greatly increased use and consequent wear and tear to which thus the highways now

are and have been subjected, has of necessity proportionately been increased and, most naturally, if, under the horse-power system of fixing registration fees, the greatly enhanced cost of improving and keeping in proper repair the highways could not be met, it would be requisite to contrive and establish some other scheme, founded upon a just and an intelligent basis, by which it could be done, and, at the same time, adjust the matter of the imposition of registration and other license fees or taxes in such manner or upon such a basis as would produce substantial equality among all owners or operators of motor vehicles, according to a proper classification thereof, in bearing the burden necessarily coincident with the work of improving and maintaining the public highways or, in other words, to establish the registration and other fees imposed upon owners or operators of motor vehicles according to a plan which would prevent discrimination as against such vehicles of the same class or of any class. And it may well be assumed that the plan adopted into the act of 1913 for the raising of revenue for highway purposes by prescribing graduated registration fees to be paid by owners of gas-propelled motor vehicles and a flat fee for electric motor vehicles was finally found to be entirely inadequate to the raising of such revenue in an amount each year which would satisfy the increased and still growing financial exactions of highway improvement and upkeep, since it is true that the legislature of 1923 passed an act establishing an entirely new system for the raising of revenue for said purpose, so far as gas and other fuel cars are concerned, by requiring, practically, the owners or operators of all such cars to pay to the state, in addition to nominal registration fees, two cents per gallon for all gas consumed in the operation thereof. (Stats. 1923, p. 571.) It is true that the license tax of two cents per gallon on all fuel gas sold and distributed by those engaged in the business of selling the same for motor vehicle purposes is not a direct license tax upon those owning or using such vehicles, yet, that the act operates indirectly to impose upon the owners or operators of such vehicles a tax of two cents on every gallon of gas that they purchase for use in propelling motor vehicles, is, from the very nature and logic of the situation, indisputably true. This proposition irresistibly follows from the fact that taxes assessed against the goods and wares of

the vendor thereof and by him paid are always included in so-called "overhead expenses," and, of course, constitute an element in the fixing of the market value of the goods, or, at all events, is an element of the cost of the goods to the consumer; and that the tax upon such gas provided by the act was intended by the legislature to be substituted for and in lieu of the license tax on motor vehicles propelled by means of gas and graded according to the horse-power standard, as provided by the act of 1913, is plainly shown by the provisions or the language thereof. The first section of the act defines the meaning of a number of the terms used in the statute, such as "motor vehicle," "motor vehicle fuel," "service station," "distributor," etc.

The second section provides that every distributor, etc., of fuel gas, so engaged when the act goes into effect, and any person, etc., intending thereafter to become such distributor, etc., shall within a specified time register as such distributor with the state board of equalization, whereupon said board shall issue to such distributor a license, etc. Section 3 fixes the tax of two cents per gallon of fuel gas sold to every owner or operator of fuel gas motor vehicles and provides that the payment thereof shall be to the state controller in quarterly installments. Section 6 provides that, within a certain period of time, specified therein, every distributor of gas fuel shall file with the state board of equalization, within twenty days after the end of each quarter, a verified statement, in a certain prescribed form, showing, among other things, the total number of gallons of motor vehicle fuel, etc., sold and distributed within the state by such distributor. Failure by any distributor to file such statement entails, by virtue of the provisions of section 8, a certain penalty, which, with the tax, must be collected by the state controller, and if the tax and penalty be not paid to that officer, then, upon his request, the attorney-general must institute and prosecute an action against the delinquent distributor to recover the taxes and all accrued penalties and interest.

The eleventh section provides that any person, firm, corporation, etc., who shall buy motor vehicle fuel for purposes other than in motor vehicles operated or intended to be operated upon public highways, and also those buying such gas to be used and used exclusively in motor vehicles employed in the transportation of rural free delivery mails

shall be reimbursed by the state in the amount of the tax on fuel gas as provided by said act, upon presenting to the state controller, in the form prescribed, a claim for the total amount so paid, all applications for such reimbursement to be filed with the controller within six months from the date of the purchase of such motor vehicle fuel.

Section 12 vests the state board of equalization with the right to make such examinations of the records of distributors as it may deem necessary for the carrying out of the provisions of the act. Section 13 provides that all license taxes collected by the state controller in pursuance of the provisions of said act shall be by that officer deposited in the state treasury and credited to the "motor vehicle fund," which the act expressly creates, and further provides that one-half of the net amount of all the moneys so received shall be paid to the counties of the state in certain designated proportions, and the same placed in "a special road improvement fund," and to be expended by the counties receiving them "exclusively in the construction and maintenance of roads, bridges and culverts in each such county." The moneys remaining after the payment of the amount above indicated to the counties are appropriated by the act (sec. 12) to the "State Highway Maintenance Fund," to be used exclusively in the maintenance, repair, reconstruction, etc., of state highways, and roads and highways in state parks. At the same session of the legislature at which the act above considered was passed, the act containing the provision (sec. 77) which constitutes the basis of the petitioner's grievance, as set forth in general language in its petition, was passed. Both acts were approved on the same day, to wit: On the thirtieth day of May, 1923. The act last referred to, as did the act of 1913, specifically or with the required particularity deals with motor vehicle traffic upon the public highways, prescribing rules regulating the use and operation of motor vehicles over and upon such highways and fixing penalties for the violation thereof. It does not, however, as in the case of motor vehicles propelled by electricity, provide for a flat registration fee of fifty dollars for gas fuel motor vehicles used for the transportation of passengers or property, and thus the cause of the controversy here arises, and to which it is now timely to give consideration.

[2] The attorney-general, representing the respondent, insists that, to determine whether the legislature, in providing for the raising of revenue for highway improvement purposes by imposing upon owners or other persons operating motor vehicles over and upon the highways of the state certain license fees or taxes, has or has not discriminated in favor of gas-propelled as against electric-propelled motor vehicles, the two statutes of 1923—the one dealing with automotive highway traffic and other matters pertaining to the use of motor vehicles, and the other levying a fuel gas tax of two cents per gallon, to be paid by all persons operating such vehicles propelled by gas—must be read and considered together as being *in pari materia*. This position is vigorously assailed by counsel for the petitioner. They assert that the doctrine of *in pari materia,* being a mere rule of construction, may appropriately be invoked only where there are two or more statutes dealing with cognate or interrelated subjects and one contains words of such dubious or doubtful meaning as to make it uncertain what the legislature intended to say by the use of such words; that in such case such statute may be read and considered with such other statute or statutes to ascertain the true meaning of such words or the intent of the legislature in so using them. In other words, and in brief, the position of petitioner's counsel is that the application of the rule referred to is limited to the ascertainment of the meaning of ambiguous words in a particular statute of several dealing with the same general subject, and is not to be resorted to for the purpose of obtaining light upon the question whether it was the legislative intent that the several statutes should together constitute a single plan or scheme for the accomplishment of a particular object. To the contention thus stated we are unable to agree. We can think of no good reason which may stand as in support of it. To the contrary, we accept as expounding the sounder interpretation of the doctrine the following statement thereof in 36 Cyc., page 1147:

[3] "Statutes *in pari materia* are those which relate to the same person or thing, or to the same class of persons or things. In the construction of a particular statute, or in the interpretation of any of its provisions, all acts relating to the same subject, or having the same general purpose, should be read in connection with it, as together constituting one

law. The endeavor should be made, by tracing the history of legislation on the subject, to ascertain *the uniform and consistent purpose of the legislature* (italics ours), or to discover how the policy of the legislature with reference to the subject-matter has been changed or modified from time to time. With this purpose in view therefore it is proper to consider, not only acts passed at the same session of the legislature, but also acts passed at prior and subsequent sessions, and even those which have been repealed.'' (See, also, *State ex rel. American Piano Co.* v. *Superior Court*, 105 Wash. 676, 679 [178 Pac. 827, 828]; *Paltro* v. *Aetna Casualty & Surety Co.*, 119 Wash. 101 [204 Pac. 1044, 1046]; *Ford* v. *Harbor Commissioners*, 81 Cal. 19, 29 [22 Pac. 278]; *Irelan* v. *Colgan*, 96 Cal. 413, 414-415 [31 Pac. 294]; *German Sav. & Loan Society* v. *Ramish*, 138 Cal. 120, 128 [69 Pac. 89, 70 Pac. 1067]; 31 Corpus Juris, p. 358, and cases named in the footnotes.)

[4] Furthermore, ''the rule that statutes *in pari materia* should be construed together applies with peculiar force to statutes passed at the same session of the legislature; it is to be presumed that such acts are imbued with the same spirit and actuated by the same policy, and they are to be construed together as if parts of the same act. They should be so construed, if possible, as to harmonize, and force and effect should be given to the provisions of each.'' (36 Cyc., p. 1151.)

And particularly in the construction of statutes relating to revenue and taxation is the rule applicable and invariably invoked upon the theory that all such statutes constitute one law. (*People* v. *Cleveland, C. C. & St. L. Ry. Co.*, 306 Ill. 459 [138 N. E. 196]; *Commonwealth* v. *P. Lorillard Co.*, 129 Va. 74 [105 S. E. 683]; *State* v. *Covington*, 35 S. C. 245 [14 S. E. 499].)

The case of *Gleason* v. *Spray*, 81 Cal. 217 [15 Am. St. Rep. 47, 22 Pac. 551], cited by petitioner as supporting his view of the scope of the rule of *in pari materia* as a canon of statutory construction, while stating that, in construing a certain section of the Civil Code which contained certain words whose meaning, as so used, was obscure, said section, to ascertain the meaning of the ambiguous words, should be considered with other sections of the code relating to the same subject, does not hold that the rule of construction thus

invoked is confined in its application merely to the ascertainment of the meaning of ambiguous words used in a statute. Nor do the cases of *Stevenson* v. *Colgan*, 91 Cal. 649 [25 Am. St. Rep. 230, 14 L. R. A. 459, 27 Pac. 1089], *Conlin* v. *Supervisors*, 99 Cal. 17 [37 Am. St. Rep. 17, 21 L. R. A. 474, 33 Pac. 753], and *Los Angeles Co. F. C. Dist.* v. *Hamilton*, 177 Cal. 119 [169 Pac. 1028], also cited by petitioner. [5] Of course, the office of the rule is that of interpretation and of construction. If, in order properly to construe a statute, words used therein are of such dubious or uncertain meaning that the real legislative intent of the act cannot be determined, when it is considered by itself or alone, then, of course, other statutes or acts upon the same subject, or the history of the legislation thereon, may and should be considered if, by that course, the meaning of the words as intended by the legislature may be learned, and if so learned, thus open the way for a construction of the statute in accord with the intent at the bottom thereof. [6] On the other hand, where a legislative act contains no uncertain or misguiding words, but taken alone, although the subject matter thereof be within legislative cognizance, it would, nevertheless, offend certain restrictions or inhibitions of the state or federal constitution, then, in that case, if there be any other statute or statutes *in pari materia* with such act, the several acts or statutes should be construed together as if they constitute but one law, if, in so doing, they harmonize in the achievement of the central purpose of their enactment and at the same time remain within the commands or inhibitions of the state and federal constitutions.

It is perfectly clear, as has been before stated, that the provisions themselves of the act of 1923 imposing a tax of two cents on every gallon of fuel gas, to be used in gas-propelled motor vehicles, show that the legislature, *ex industria*, intended that that plan of imposing a privilege tax on those operating or causing to be operated such motor vehicles upon the highways of the state should be in lieu of the registration fee such persons were theretofore required to pay. [7] We, therefore, hold that the two acts of 1923 under consideration, in so far as they provide, respectively, for a registration fee for electric motor vehicles and the excise or privilege tax on gas for gas-propelled motor vehicles were intended to constitute a single plan or scheme for

compelling persons operating or causing to be operated
motor vehicles upon the public highways of the state to pay
a fee or a tax, according to the character of such vehicles
as to the method of their propulsion, and that the two acts
in that particular are *in pari materia;* that, in effect, they
constitute one law. [8] So considering the two acts, we
can perceive no reason for holding that there is any dis-
crimination in the matter of the privilege fee or tax which
the operators of the two classes of motor vehicles are,
respectively, required to pay. We cannot so declare from
the face of the statutes. It may be that, in particular in-
stances, the amount paid by the operators of gas-propelled
motor vehicles used for the transportation of passengers or
property in some years is and will be less than the flat 'fee
required to be paid by operators of freight or passenger
electric motor vehicles. On the other hand, it may be (and
we doubt not that this is true) that in many instances the
amount paid as the tax on fuel gas purchased and used by
persons operating or causing to be operated gas-propelled
passenger or freight motor vehicles is annually far in excess
of the sum of fifty dollars, the amount of the registration
fee exacted from those operating like electric motor vehicles.
The problem is not one of easy solution. It is, however, a
problem the solution of which is peculiarly and exclusively
one of legislative cognizance, and an approximately fair and
equitable adjustment of the whole matter is, perhaps, all that
may or should reasonably be expected. The presumption
is that the legislature, in establishing the existing plan, fully
investigated the facts upon which it acted in fixing a flat
fee in the one case and a fuel gas tax in the other and in
placing the fee for electric motor vehicles used for freight
or passenger transportation at fifty dollars, and the statutes
themselves constitute a finding that the system established
by those acts will bring and has brought about as near an
equitable adjustment, as between the operators of the two
classes of motor vehicles so used, of the amounts they should
respectively pay for the privilege of using the highways, as
is practicable. (Cooley's Const. Limitations, 187; *Steven-
son* v. *Colgan,* 91 Cal. 649, 653 [25 Am. St. Rep. 230, 14
L. R. A. 459, 27 Pac. 1089].) [9] Of course, the courts
cannot go behind legislative enactments which, upon their
face, are in complete harmony with the constitution, and,

by a resort to evidence, attempt to ascertain whether the legislature, in passing them, did or did not observe or remain within the restrictions which the constitution has placed upon its power as a co-ordinate branch of the government or has or has not properly performed the duty which is not only enjoined upon it by the constitution but which its members by their oaths bound themselves properly to perform. (*Stevenson* v. *Colgan, supra.*)

[10] The effect of the two statutes as to the fee or tax to be paid is necessarily to segregate the gas-propelled motor vehicles and the electric motor-trucks used for the transportation of passengers for hire or of property into two classes. Counsel for petitioner in their opening brief concede the validity of the classification by subdivision (b) of section 77 of electric motor vehicles into those designed for the transportation of passengers for hire or for the transportation of property and those designed and used for other purposes as a basis for differentiating in the amount of the tax or fee to be exacted from the owners or operators of each of the classes of such motor vehicles and further declare that they have no objection to make to the "weight tax" exacted by subdivision (c) of said section 77. But, as seen, they do contend that the imposition by subdivision (b) of an additional registration fee of fifty dollars for electric motor vehicles used for the transportation of passengers for hire or of property is not within "a classification based on a difference which bears a just and proper relation to the object to be attained, namely, the 'laying of a tax charge in the nature of compensation for the damage done to the roads of the state by the driving of these machines over them, and properly based upon the amount of destruction caused by them,'" citing *In re Schuler,* 167 Cal. 282 [Ann. Cas. 1915C, 706, 139 Pac. 685].

This brings up the question whether the fixing of the privilege tax upon persons operating motor vehicles for the transportation of passengers for hire or of property according to the essential difference in the instrumentalities by which the two kinds of such vehicles so used are operated or propelled is founded upon a classification which has the effect of removing the statutes in question, in so far as they provide for such tax in the manner explained, from the interdiction of the following provision of the state constitu-

tion: "All laws of a general nature shall have a uniform operation." (Art. I, sec. 11.)

The distinction between gas fuel motor-trucks or stages and electric motor-trucks or stages is in the difference in the means by which the two kinds are operated. Indeed, the distinction in that particular becomes the more marked and palpable when it is considered that a privilege or excise tax based upon the quantity of fuel gas used in motor vehicles so propelled may be imposed upon persons operating or causing to be operated such motor vehicles upon the public highways of the state, while it is obviously impossible to impose such tax upon those likewise operating or causing to be operated electric motor vehicles or trucks. And it is that difference between the two classes of motor vehicles which of necessity gives rise to the distinction between those persons operating or causing to be operated gas fuel motor vehicles used for property or freight transportation and those operating or causing to be operated electric motor vehicles used for the same purpose, and, in the very nature of things, the two sets of persons thus described are segregated into distinct classes, namely: 1. Those operating gas fuel motor vehicles for the transportation of passengers for hire or property; 2. Those operating electric motor vehicles for the same purpose.

[11] It is established in this state that, within the contemplation of section 2 of article I of the constitution, a law is general and uniform in its operation if it operates uniformly upon "all persons standing in the same relation to the law in respect to the privileges and immunities conferred by it or the acts which it prohibits." (*City of Pasadena* v. *Stimson,* 91 Cal. 238, 251 [27 Pac. 604, 607]; *Ex parte Smith and Keating,* 38 Cal. 710; *Brooks* v. *Hyde,* 37 Cal. 366.) True, to render a law general which cannot be made applicable to the entire body of the people free from fatal discriminatory provisions in favor of and, in a corresponding degree, against certain members thereof, there must be a classification of the people founded upon some "natural or intrinsic or constitutional distinction." (*City of Pasadena* v. *Stimson, supra.*) In other words, a law cannot be general and uniform in its operation, within the meaning and intent of the constitutional provision above referred to, "if it confers particular privileges or imposes peculiar disabili-

ties or burdensome conditions, in the exercise of a common right, upon a class of persons arbitrarily selected from the general body of those who stand in precisely the same relation to the subject of the law." (Id.)

Nothing could be clearer than that the automatic segregation by the acts in question of the persons operating fuel gas motor vehicles employed in the transportation of passengers for hire or the transportation of property and electric motor vehicles likewise used for the purpose of fixing a tax charge peculiarly appropriate to the character of such motor vehicles with respect to the means by which they are propelled, into different classes, involves a classification founded upon an intrinsic distinction arising from the essential difference in the agencies by which such motor vehicles are operated. The classification is as well grounded as is the classification made by one of the acts herein concerned as between electric motor vehicles used in the business of transporting passengers for hire or of property and electric motor vehicles used for other purposes, of which classification counsel for petitioner, as seen, voluntarily vouchsafe their approval. Indeed, the distinction upon which the classification herein is based is no less intrinsic or natural than that which exists or would exist as between those persons conducting a trucking or a freight or passenger business by means of motor vehicles fed with fuel gas or by electricity and those operating trucks or passenger stages solely by the aid of horses or mules. All persons belonging to either of the classes thus established stand in precisely the same relation to the law with respect to the burdens it imposes. There is, in other words, no discrimination as between any of the persons belonging to either class. All in each class stand upon an absolute equality, in so far as are concerned the duties enjoined or the burdens imposed by the law.

Concluding the discussion, it is pertinent to observe that other states have adopted such a plan of classification for the imposition of a privilege tax upon those using the public highways by means of motor vehicles as the acts in question have established in California, and that, although attacked in the higher courts of such states upon every conceivable constitutional ground, the plan has been upheld. Among the sister states referred to are Ohio, Massachusetts, Penn-

sylvania and Maryland. In the case of *Graves* v. *Ohio*, 2 Ohio App. 383, decided in February, 1914, the court, dealing with a statute which in principle makes such a classification as is involved in the acts in question here, used the following language which is cogently pertinent in all respects to the case in hand: ''The uniformity clause of the constitution does not prevent reasonable classification of the subjects of legislation. Motor vehicles are a just subject of classification in respect to the use of public highways as distinguished from horse-drawn vehicles. . . . This classification deals more especially with the necessity of police regulation. The burden of highway maintenance as between motor vehicles and horse-drawn vehicles is as clearly pronounced. . . . From the evidence we are advised that the basis of horse-power rating adopted by the act is well recognized and has been employed by leading manufacturers, and while in the recent development of engine-making there may be some inaccuracy, still we think this basis is sufficiently definite to justify legislative adoption. The standard adopted is a formula. There is no delegation of power. The formula existing at the time of the enactment continues until changed by the legislature. There is also sufficient reason for the flat-rate charges upon electrics. The electrics in general use are comparatively slow moving and of low horsepower. While it may be true that electrics of high speed have been constructed yet it is equally true that they are not in general use. Should they become so, it will be ample time for the legislature to act.''

[12] From what has been said herein it is clear that that portion of the fourteenth amendment to the federal constitution prohibiting the making or enforcement of any law which shall abridge the privileges or immunities of citizens of the United States or which shall deprive any person of life, liberty, or property without due process of law or denies to any person within its jurisdiction the equal protection of the laws is not offended by the legislation in question.

For the foregoing reasons the judgment is affirmed.

Finch, P. J., and Plummer, J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on January 14, 1926.