**PAULEY v. STATE OF CALIFORNIA.**
No. 7383.

Circuit Court of Appeals, Ninth Circuit.
Dec. 21, 1934.

Joseph J. Rifkind and Geo. A. Elstein, both of Los Angeles, Cal., for appellant.

U. S. Webb, Atty. Gen., State of California, and Bayard Rhone and H. H. Linney, Deputy Attys. Gen., for the State of California.

Before WILBUR, SAWTELLE, and GARRECHT, Circuit Judges.

The following opinion, prepared by SAWTELLE, Circuit Judge, is adopted as the opinion of the court by WILBUR and GARRECHT, Circuit Judges:

During the period involved in the instant case, the Motor Vehicle Fuel Tax Acts of California provided that every distributor should pay a 3-cent license tax on each gallon of motor vehicle fuel sold and distributed in the state. Pursuant to those acts, the state filed its claim against the receivership estate of Producers & Refiners, Inc., Limited. The claim was allowed in the sum of $12,121.71.

The appellee state contends that it has a lien for that amount upon all the property of the Producers & Refiners Company, and to the proceeds from the sale of such property in the possession of the receiver, and that by virtue of the lien it is entitled to priority over all the general unsecured creditors.

The appellant maintains (1) that the statutes above referred to are unconstitutional, and (2) that, even if the acts are constitutional, still the state is not entitled to any priority of payment because no valid lien was created by those statutes.

The amount of the tax is not in dispute. When the appellant receiver rejected the claim, the court below referred the hearing of objections to a special master. The question of the validity of the acts and the priority of any claim thereunder was submitted on briefs, without the introduction of any testimony.

The special master filed his report with the court below recommending that the Motor Vehicle Fuel Tax Acts were valid, and that the state's claim was entitled to priority over all other claims in the receivership estate. The court below confirmed the report of the special master, and the present appeal resulted.

In view of the varied grounds of attack relied upon by the appellant with regard to the legislation in question, we are transcribing in the margin, with some degree of fullness, the pertinent portions of the statutes.[1]

The appellant's first assault upon the constitutionality of the acts in question is bottomed on the fact that "the flat sum of

---

[1] Act 2964, printed under title 220, "Gasoline," 1 Deering's General Laws of California, 1931, pages 1425-1439, contains the following provisions:

"Act 2964—An act to regulate and license the business of producing, refining or distributing gasoline,"

"§ 2. Distributors' License. Application. Bond. Every distributor before April 1, 1931, and after this act becomes effective every person, firm, association or corporation before becoming a distributor shall make an application to the state board of equalization for a license authorizing such distributor * * * to engage in business as a distributor. * * * Before granting any license authorizing any * * * corporation to engage in business as a distributor, the state board of equalization must require such * * * corporation to file with said board, in such form as shall be prescribed by said board, a bond duly executed by such * * * corporation as principal and a corporation such as is mentioned in section 1056 of the Code of Civil Procedure * * * as surety, payable to the people of the state of California, conditioned upon faithful performance of all of the requirements of this act and expressly providing for the payment of all license taxes, penalties and other obligations of such * * * corporation arising out of this act.

"Amount of Bond. If Weekly Payment Undertaken. The total amount of the bond or bonds required of any distributor shall be fixed by the state board of equalization and may be increased or reduced by said board at any time subject to the limitations herein provided. In fixing the total amount of the bond or bonds required of any distributor, the state board of equalization must require a bond or bonds equivalent in total amount to twice his estimated monthly license tax determined in such manner as said board may deem proper; provided, however, that, subject to such terms and conditions as the state board of equalization may prescribe, any distributor may undertake to pay on each Tuesday the license tax accruing on all of his distributions of motor vehicle fuel during the week ending the Saturday next preceding, and, if any distributor shall so bind himself, said board shall fix his bond or bonds in a total amount equivalent to one and one-half times the license tax accruing on account of his estimated weekly distributions determined in such manner as said board may deem proper; and further provided that the total amount of the bond or bonds required of any distributor shall never be less than one thousand dollars nor more than one hundred thousand dollars."

"§ 3. License Tax to be Paid by Distributor. Every distributor shall from and after September 30, 1923, in addition to any other taxes provided by law, pay a license tax to the state controller of this state of two cents for each gallon [Amended in 1933 to provide for license tax of three cents for each gallon] of motor vehicle fuel refined, manufactured, produced or compounded by such distributor in this state and sold and delivered by him in this state,"

"§ 4. Payment of Tax. Tax a Lien on Distributor's Property. When Delinquent. Penalty. License taxes herein required to be paid shall be payable in monthly installments to the state controller for the month ending April 30, 1931, and each and every calendar month thereafter. The license tax shall be a lien upon all property of the distributor, attaching at the time of delivery or distribution subject to said license tax, having the effect of an execution duly levied against all property of the distributor, and remaining until the license tax is paid, or the property sold in payment thereof. The amount of such license tax for each month shall be paid on or before the first day of the second calendar month thereafter, and if not paid prior thereto, shall become delinquent at five o'clock in the afternoon of said day, and ten per cent. penalty shall be added thereto for delinquency. * * *

"Collection of Tax if Delinquent. Seizure of Property. Notice of Intended Sale. Whenever any distributor shall be delinquent in the payment of the license tax herein provided, the controller or his

three cents per gallon of gasoline \* \* \* is not in proportion to the value of said gasoline. It does not take into consideration the various qualities of gasoline, together with their corresponding deviation in value, nor does it take into consideration the fluctuations in value of gasoline, nor does it take into consideration the value of gasoline at all."

Article 13, § 1, of the Constitution of California provides in part: "All property in the State except as otherwise in this Constitution provided, not exempt under the laws of the United States, shall be taxed in proportion to its value, to be ascertained as provided by law, or as hereinafter provided. The word 'property,' as used in this article and section, is hereby declared to

---

duly authorized representative shall proceed forthwith to collect the license tax due from such distributor in the following manner: The controller shall seize any property, real or personal, used by such distributor in the operation of his business, and thereafter sell at public auction such property so seized, or a sufficient portion thereof, to pay the tax due hereunder, together with any penalty or penalties imposed hereby for such delinquency, and any and all costs that may have been incurred on account of such seizure and sale. Notice of such intended sale and the time and place thereof, shall be given to such delinquent distributor in writing at least ten days before the date set for such sale by inclosing a form of such notice in an envelope addressed to said distributor at his last known place of business in this state if any, and depositing the same in the United States mail, postage prepaid, and by publication for at least ten days before the date set for such sale in a newspaper of general circulation published in the county or city and county in which the property seized is to be sold; provided, however, that if there be no newspaper of general circulation in such county or city and county, then by the posting of such notice in three public places in such county or city and county for said ten day period. The said notice shall contain a description of the property to be sold, together with a statement of the amount of the taxes, penalties and costs, the name of the distributor, and the further statement that, unless such taxes, penalties and costs are paid on or before the time fixed in said notice for such sale, said property, or so much thereof as may be necessary, will be sold in accordance with law and said notice.

"*Sale.* At any such sale, the property shall be sold by said controller or his duly authorized agent in accordance with law and said notice, and the controller shall deliver to the purchaser a bill of sale for the personal property, and a deed for any real property so sold, and such bill of sale or deed shall vest title in the purchaser. The unsold portion of any property so seized may be left at the place of sale at the risk of the distributor. If, upon any such sale, the moneys so received shall exceed the amount of all license taxes, pen-

alties and costs due the state from such distributor, any such excess shall be returned to the distributor, and his receipt therefor obtained. If, for any reason, the receipt of such distributor shall not be available, the controller shall deposit such excess moneys with the state treasurer, as trustee for such owner, subject to the order of such distributor, his heirs, successors or assigns.

"*Forfeiture of Bond or Deposit.* The controller must also immediately transmit notice of such delinquency to the attorney general who shall at once proceed to collect all sums due to the state from any such distributor hereunder by bringing suit against the necessary parties to effect forfeiture of the bond or bonds of the distributor or of the money or securities deposited by the distributor with the state treasurer in accordance with the terms of section 2 of this act, reducing any deficiency to judgment against the distributor.

"*Remedies Cumulative. Assessment-roll as Evidence.* It is expressly provided that the foregoing remedies of the state shall be cumulative and that no action taken by the controller or the attorney general *shall be or be construed to be an election* on the part of the state or any of its officers to pursue any remedy hereunder or be construed to be an election *edy for which provision is made in this* act. \* \* \*"

"§ 9. *Proceedings if Tax not Paid.* If the license tax and such penalties as may have been incurred thereon chargeable to any distributor are not fully paid by the delinquent date specified in section 4 of this act, the controller shall notify forthwith the state board of equalization, who must cite said distributor to appear within ten days before said board and show cause why his license under section 2 of this act should not be revoked, as prescribed by section 14 hereof."

Act 2965, 1 Deering, op. cit., at pages 1439, 1440, provides, in section 1, that "every distributor, as defined in said 'original act' [Act 2964, supra], shall pay a license tax to the state controller of this state of an additional one cent for each gallon of motor vehicle fuel, as defined in said 'original act,' "

include moneys, credits, bonds, stocks, dues, franchises, and all other matters and things, real, personal, and mixed, capable of private ownership. * * *"

The appellant asserts: "The right to engage in a business is a property right, and even though it may be contended that the tax is not a tax upon the property, referring to the gasoline, it must be conceded that it is a tax upon the property, to-wit, the right to engage in the sale and distribution of gasoline."

At the outset, it is to be observed that the legislation in question has been repeatedly held to be constitutional by the courts of California. People v. General Petroleum Corp., 204 Cal. 297, 299, 268 P. 352, 283 P. 60; People v. Sterling Refining Co., 86 Cal. App. 558, 567, 261 P. 1080. See, also, State of California v. Gillis, 69 F.(2d) 746, 748, decided by this court, and affirmed by the Supreme Court of the United States on November 5, 1934, 55 S. Ct. 4, 79 L. Ed. ——. In this connection, however, it should be stated that in none of those cases was there presented the precise constitutional questions that we are here considering.

For a proper solution of the constitutional problems involved in the instant case, it is first necessary to determine the classification to which the statutes in question belong.

The title of each of the two acts (Act 2964 and Act 2965) describes the legislation as designed "to regulate and license the business of producing, refining or distributing gasoline," etc. The Supreme Court of California has definitely classified these statutes as levying "an excise or occupation tax" or a "license tax," and has declared that the title of the acts was so apt as to "satisfy even the most hypercritical mind." People v. Ventura Refining Co., 204 Cal. 286, 294, 297, 268 P. 347, 283 P. 60; People v. General Petroleum Corp., supra, 204 Cal. at pages 299 and 300, 268 P. 352, 283 P. 60; People v. Richfield Oil Co., 204 Cal. 301, 304, 268 P. 353. See, also, People v. Sterling Refining Co., supra, 86 Cal. App. at pages 563, and 567, 261 P. 1080; George E. Breece Lumber Co. v. Mirabal, 34 N. M. 643, 287 P. 699, 700, 701, 84 A. L. R. 827, affirmed George E. Breece Lumber Co. v. Asplund, 283 U. S. 788, 51 S. Ct. 352, 75 L. Ed. 1415.

■ A license-tax is an "excise," or a "privilege" or "occupation" tax. Within the meaning of the constitutional provision that we are now discussing, it is not a "prop-erty" tax. The Supreme Court of California has repeatedly so held.

In City and County of San Francisco v. Pacific Tel. & Tel. Co., 166 Cal. 244, 249, 135 P. 971, 974, the court said: "It is true that a license tax upon an occupation or business is not a tax upon property, even though, by constitutional or statutory definition, franchises are included in the meaning of the word 'property.' This is clearly decided in City of Los Angeles v. Los Angeles Independent Gas Co., 152 Cal. 765, 93 P. 1006."

The appellant seeks to distinguish the Los Angeles Case, cited supra, from the case at bar, on the ground 'that the former involved a city license tax for a flat sum, "and not a tax for revenue purposes," in the instant case. But the levying of a *flat sum* as a license tax, "regardless of business done," is even less a proportioning to value than is a tax measured by the number of gallons of fuel sold. And in its statement that the tax in the Los Angeles Case was not a revenue measure, the appellant is in error; for there the Supreme Court plainly said, at page 769 of 152 Cal., 93 P. 1006, 1007: "The tax here levied is not an exercise of the police power, but of the power of taxation. * * *"

The essential difference between a privilege tax and a property tax was elaborated by the state Supreme Court, in the case of Pacific Gas & Electric Co. v. Roberts, 168 Cal. 420, 430, 143 P. 700, 703: "The essential difference between an ad valorem tax and any form of privilege tax is that the ad valorem tax is based upon the value of the property, tangible or intangible. *The privilege tax need not be based upon such value at all.* Privilege taxes themselves fall into two general classes: the first, a tax upon that intangible thing known as the right to conduct business; and the second, a tax upon specific personal property as a condition of the right to use it generally or for some specific purpose. * * * Thus such a tax may be imposed upon the right to conduct the business of a taxicab company, and again a tax may be imposed upon each taxicab, to be paid before that particular piece of personal property may be employed in the business. Of course, as in the case of every tax, and upon whatsoever form or kind of property it may be laid, in its essence, it is a tax upon the owner of the property." (Italics our own.)

Referring to a "corporation license tax," the Supreme Court of California has classi-

fied such a measure as a "privilege" tax, saying, in the case of Kaiser Land & Fruit Co. v. Curry, 155 Cal. 638, 653, 654, 103 P. 341, 347: "It is substantially the purchase price which the state has seen fit to charge for the continuance of the privilege of being and acting as a corporation. Although this privilege had already been granted to plaintiff and all other existing corporations, it had been granted subject to the power reserved by the state, to be exercised by general laws, of revocation, or the imposition of new charges therefor, or new conditions upon which it might be enjoyed. The charge is in no sense a tax *upon the thing granted,* as is the tax imposed under section 1, art. 13. It is a mere license fee charged for the privilege, and is not a tax upon property at all, and the requirements of section 1, art. 13, of the Constitution do not apply thereto. [Many cases cited.]"

It is worthy of note that in the foregoing case, the "license tax" was "proportioned to the amount of the authorized capital stock of the corporation," just as in the instant case, the amount of the "license tax" is proportioned to the amount of gasoline sold. Yet in that case, the court held that the "license fee" "was not a tax upon property at all."

In 1876 when the case of City of Santa Barbara v. Stearns, 51 Cal. 499, 501, was decided, the Constitution of 1849 was in effect in California. Section 13 of article 11 of that organic law read as follows: "Taxation shall be equal and uniform throughout the State. All property in this State shall be taxed in proportion to its value, to be ascertained as directed by law. * * *"

It will thus be seen that the pertinent provision of the Constitution was substantially the same as the one in force at the present time, save that there was then no attempt to define the word "property." With such a provision before it, the Supreme Court of the state said: "A license charge or fee for the transaction of business, is in our opinion a tax within the meaning of the term 'tax,' as employed in those sections [not pertinent here]. It is not a tax within the meaning of section 13 of article 11 of the Constitution, but is a tax in a large sense, as being a charge or burden imposed upon persons, property or business, to raise money for public purposes. [Many cases cited.]"

See, also, 16 Cal. Jur., §§ 3, 9, pp. 189, 190, 200; and 24 Cal. Jur., § 25, p. 43.

According to the jurisprudence of California, the mere fact that, as a *measure* of the amount of license tax that is to be paid, the statute designates a standard other than the *value* of the property involved, does not militate against the validity of the tax. In 16 Cal. Jur., § 32, pp. 235, 236, we find the following statement: "The license tax to be paid by those engaged in a certain business or occupation may be, and often is, made to depend on its magnitude—the receipts, sales or business transacted. * * * And, it has been stated, among the varying standards which may be adopted, it cannot be objected to as unfair or unreasonable that a distinction is based upon the number of vehicles and animals which are used in the prosecution of the business; this, as in the case of distinguishing a class by the number of persons engaged, is a method of gauging the amount of business done or the capital employed and of imposing a tax upon the occupation under such gradation. A license tax upon the operation of motor vehicles may properly be graduated according to horse-power."

If horse power is not an objectionable standard for the fixing of a license tax, assuredly the number of gallons of gasoline distributed by a dealer cannot be said to be a violation of the organic law.

License taxes measured by standards of volume other than value have been repeatedly upheld by the Supreme Court of California.

In San Jose v. S. J. & S. C. R. R. Co., 53 Cal. 475, 476, 481, the court had before it an ordinance passed by San Jose, taxing street railroads $20 *on every car* used in the business. The ordinance was held to be a revenue measure, and was sustained.

In Ex parte Mirande, 73 Cal. 365, 374, 375, 14 P. 888, 892, the license tax was imposed upon sheep growers, and was measured by *the number of sheep* owned by them. Declaring that the question of whether the license had been imposed for revenue or for regulatory purposes was unnecessary to discuss, because the board of supervisors "possessed authority to impose it for either or for both," the Supreme Court dismissed a writ of habeas corpus that had been sued out by one convicted of having violated the ordinance.

The constitutionality of the Motor Vehicle Act of 1913 (St. 1913, p. 639) was upheld by the court in Matter of Application of Schuler, 167 Cal. 282, 285, 289, 290, 139 P. 685, 689, Ann. Cas. 1915C, 706. That stat-

ute provided for the registration of automobiles according to their horse power. The smallest fee was fixed at $5 for every vehicle of less than twenty horse power and the largest at $30 for every car of sixty horse power and more. The court said:

"The contention is made (and correctly made) that it imposes an *excise tax or privilege tax* for the purpose of providing a fund for roads under the dominion of the state authorities. Similar laws have been upheld in other states upon exactly that theory. In Kane v. State, 81 N. J. Law, 594, 80 A. 453 [L. R. A. 1917B, 553] Ann. Cas. 1912D, 237, a statute very much like this was under review. A resident of another state was attacking the New Jersey law which imposed the tax upon the owners of all automobiles using the public roads of New Jersey. The law was sustained. It was conceded that under the proofs before the court *the statute was a revenue measure and not one passed purely in the exercise of the state's police power. There, as here, the point was made that the act was void because it sought to fix the amount of the tax arbitrarily and not in accordance with the value of the property.* The court, among other things, said:

" 'The charging of an annual sum for the use of its highways by automobiles, instead of a mileage fee, is clearly a matter within the discretion of the state. No constitutional objection lies in the way of a legislative body prescribing any mode of measurement to determine the amount it will charge for the *privilege* it bestows. Home Insurance Co. v. New York, 134 U. S. 594, 10 S. Ct. 593, 33 L. Ed. 1025. The only limit upon its power is that the amount charged shall not be unreasonable; and there is no suggestion that such a condition is created by the present law.

" 'We conclude therefore that the contention of the plaintiff in error that the act of 1908 contravenes the federal Constitution, is without substance.

" 'It is further contended, on behalf of the plaintiff in error, that the imposition provided by the act of 1908 is a *property* tax, and invalid because it is imposed without regard to the value of the property upon which it is laid. What we have already said disposes of this contention. *The character of the imposition is not determined by the mode adopted in fixing its amount.* [Case cited.] The imposition is a license or privilege tax charged in the nature of compensation for the damage done to the roads of the state by the driving of these machines over them, and is properly based, not upon the value of the machine, but upon the amount of destruction caused by it.' [Case cited.]

"The fact that an ad valorem tax is levied by local authorities upon all automobiles as property does not make this double taxation, which only occurs when the same property is taxed twice by the same government during the same period. [Many cases cited.]" (Italics our own.)

In the discussion of the three preceding decisions, we have emphasized the question of whether or not the statutes there considered were for revenue or for regulation. We have done so because the appellant earnestly contends that, because the gasoline tax acts that we now have before us are revenue measures, they "cannot be construed as an inspection or license tax, constituting an exception to the provisions of said article 13, § 1, of the California Constitution." We have seen, however, that the mere revenue character of a license tax statute in no way brings it within the constitutional requirement that "all property in the State * * * shall be taxed in proportion to its value." See, also, City and County of Sacramento v. Crocker, 16 Cal. 119.

The jurisprudence of California on this subject accords with general law.

In Bowman v. Continental Oil Co., 256 U. S. 642, 649, 41 S. Ct. 606, 608, 65 L. Ed. 1139, the Supreme Court of the United States had before it a New Mexico excise tax of 2 cents for each gallon of gasoline sold or used, and an annual license tax of $50 for each distributing station or place of business. Of the former tax, similar to the one at bar, the court said: "Section 1, art. 8, of the state Constitution, invoked by plaintiff, reads: 'Taxes levied upon tangible property shall be in proportion to the value thereof, and taxes shall be equal and uniform upon subjects of taxation of the same class.' Clearly the first part of this refers to property taxation. The tax imposed by the act under consideration upon the 'sale or use of all gasoline sold or used in this state' is not property taxation, but in effect, as in name, an excise tax. We see no reason to doubt the power of the state to select this commodity, as distinguished from others, in order to impose an excise tax upon its sale and use; and since the tax operates impartially upon all, and with territorial uniformity throughout the state, we deem it 'equal and uniform upon subjects of

taxation of the same class,' within the meaning of section 1 of article 8."

The appellant seeks to distinguish the foregoing case from the one at bar, on the ground that the New Mexico Constitution provides that taxes only upon "tangible" property "shall be in proportion to the value thereof." But the Supreme Court laid down the broad principle that "the tax imposed by the act * * * is not property taxation," without distinguishing between *tangible* and *intangible* property.

In Alaska Fish Co. v. Smith, 255 U. S. 44, 50, 41 S. Ct. 219, 65 L. Ed. 489, the court sustained statutes of Alaska levying "license taxes of two dollars a barrel and two dollars a ton respectively, upon persons manufacturing fish oil, fertilizer and fish meal in whole or in part from herring." Of such legislation, Mr. Justice Holmes said: "This is not a property tax."

In Ohio Tax Cases, 232 U. S. 576, 592, 593, 34 S. Ct. 372, 376, 58 L. Ed. 737, the court considered a state tax on the gross intrastate earnings of railroads. The court denominated the tax an "excise or privilege tax," "not a property tax," and thus emphasized the distinction: " * * * The exaction of 4 per cent of the gross intrastate earnings is not a property tax, but an excise tax, whose amount is fixed and measured by such earnings; and double taxation in a legal sense does not exist unless the double tax is levied upon the same property within the same jurisdiction. Plaintiffs in error pay one tax with respect to property, another with respect to the privilege or occupation; hence the taxation is not double. [Cases cited.]"

See, also, State of Maine v. Grand Trunk Ry. Co., 142 U. S. 217, 228, 229, 12 S. Ct. 163, 35 L. Ed. 994; Knowlton v. Moore, 178 U. S. 41, 88, 20 S. Ct. 747, 44 L. Ed. 969; Thomas v. United States, 192 U. S. 363, 370, 24 S. Ct. 305, 48 L. Ed. 481.

This court has on more than one occasion held that a license tax, though measured in terms of property, is not a property tax.

In Alaska Pacific Fisheries v. Territory of Alaska, 236 F. 52, 58, 61, this court had before it an act of the territorial Legislature of Alaska (chapter 76) providing as follows: "Section 1. That any person, firm or corporation prosecuting or attempting to prosecute any of the following lines of business in the Territory of Alaska shall apply for and obtain a license and pay for said license for the respective lines of business as

follows: * * * 8th. Fish Traps: Fixed or floating, one hundred dollars per annum. So called dummy traps included."

Of such a license tax, Judge Hunt said:

"Does it follow that, because the license tax imposed by the territorial Legislature is a measure *creating revenue,* it conflicts with that portion of section 9 of the Organic Act providing that:

" 'All taxes shall be uniform upon the same class of subjects and shall be levied and collected under general laws, and the assessment shall be *according to the actual value thereof.'*

"We take it to be indisputable that the creation of revenue by the imposition of license taxes upon carrying on of business is, in a general sense, a rightful subject of legislation. But in this matter inquiry into the general question is unnecessary, for, as already pointed out, we have express transfer of authority to the territorial Legislature *to impose license taxes.* The power, therefore, being in the Legislature, *such taxes may be imposed without the restrictive limitations which must control in levying taxes upon property in its usual sense.*" (Italics our own.)

The foregoing decision was cited with approval by Mr. Justice Holmes in the Alaska Fish Co. Case, supra.

Another territorial statute of Alaska was involved in Northern Commercial Co. v. Territory of Alaska (C. C. A. 9) 289 F. 786, 787. In that case, however, the license tax was even more nearly like the one at bar, for there, too, the amount of the tax was proportioned, in part at least, to the *units* and not the *value* of the merchandise involved. The Legislature of the territory (Laws 1921, c. 42) prescribed in section 1 of the act a license fee of $10 for the business of fur farming, etc., and in section 3 further provided: "In addition to the license fee above provided for the licensee shall pay to the Commissioner who issued the license the following license fees on each pelt taken by a fur-farmer or purchased or otherwise acquired by a fur-buyer, or taken by a trapper and not sold to a licensed fur-buyer."

Then followed a designation of the various kinds of skins dealt in by such licensees, with the amount of license tax payable upon each kind. The following language was used by the late Judge Gilbert, who delivered the opinion of the court:

"The plaintiff in error contends that in levying the tax prescribed in section 3, the

Legislature imposed a tax upon each article of property handled by the fur dealer under his license, and that it is therefore an ad valorem tax on property, and void for the reason that it is not levied in accordance with the provisions of the Organic Act, section 9 of which provides that—

"'All taxes shall be uniform upon the same class of subjects and shall be levied and collected under general laws and the assessment shall be according to the actual value thereof. No tax shall be levied for territorial purposes in excess of one per cent. upon the assessed valuation of the property therein in any one year.'

"It is not disputed that the tax here involved is valid, if it is an excise tax, *as distinguished from a property tax*. In determining its nature, section 1 and section 3 must be construed together. Property taxes are taxes assessed on all property of a certain class in proportion to its value on a specified date. It is assessed at a stated period and collected at an appointed time. An excise tax, as the term itself indicates, is a sum *cut out* of that which is received or enjoyed by the person subjected thereto.. It includes every tax upon the privilege of performing an act or engaging in a business or occupation. Society for Savings v. Coite, 6 Wall. 594, 18 L. Ed. 897. Measured by these definitions the tax here in question is clearly an excise tax. The exaction thereof does not require the intervention of assessors or appraisers to estimate the value of the property. It does not become a property tax by reason of the fact that a certain prescribed sum is exacted upon the sale of each pelt. The fact that it establishes a schedule by which a specific sum is levied upon each article of commerce dealt in by the fur buyer does not change the nature of the tax. 26 R. C. L. 37." (Italics our own.)

The foregoing decision was cited with approval in Haavik v. Alaska Packers' Ass'n, 263 U. S. 510, 513, 514, 44 S. Ct. 177, 68 L. Ed. 414.

See, also, Utah Power & Light Co. v. Pfost (D. C.) 52 F.(2d) 226, 230, an Idaho three-judge case decided in this circuit; Breece Lumber Company Case, supra, 34 N. M. 643, 287 P., at pages 700, 701, 84 A. L. R. 827; 1 Bouvier (Third Revision) pages 1109, 1110, excise; 2 Words and Phrases, Second Series, page 371; 3 Words and Phrases, Third Series, pages 399 and 401, 402; Cyclopedic Law Dictionary (2d Ed.) page 379.

We hold, therefore, that the gasoline tax in question is an excise and not a property tax; and that, not being a property tax, it need not be assessed in proportion to the value of the property involved.

■ We advance to the next ground of attack urged by the appellant against the Motor Vehicle Fuel Tax Acts; namely, that they are discriminatory in that "a small distributor is penalized whereas an exceedingly large distributor is being favored by virtue of the fact that the bond in any event cannot be less than $1,000 and never greater than $100,000, so that in some instances it may be asking a small distributor to place a greater bond than his estimated distribution would warrant, and in other instances oblige the State Board of Equalization to make an exceedingly large distributor give a bond very much less than the estimated amount of distribution."

It is observable that the appellant is not complaining that in his case the bond required was excessive. On the contrary, he is merely asserting that "in some instances" the statutory requirement *may* result in "asking a small distributor to place a greater bond," etc. As we have seen, the undisputed amount of the tax is $12,121.71. According to report of the special master, the principal amount of the surety bond posted with the state to insure the payment of the tax in question was $6,000, less than one-half of the tax actually claimed. The appellant does not question the special master's statement in this respect.

The appellant, therefore, is in no position to attack the provisions of the statute regarding the distributor's bond.

In Moore v. Webb, 219 Cal. 304, 26 P. (2d) 22, 24, 89 A. L. R. 925, decided October 27, 1933, the Supreme Court of the state had before it, inter alia, section 2 of the Motor Club Service Act of 1929 (St. 1929, p. 1730), which required the deposit with the insurance commissioner of the *flat sum* of $100,000 in cash or securities approved by the commissioner, or a surety bond, also to be approved by him, to insure faithful performance in the sale or rendering of motor club service and the payment of any fines or penalties for failure to comply with the act. A certificate to be issued by the commissioner was also required, for which an annual license fee of $10 was exacted.

It will be observed that the Motor Club Service Act requires a bond in no way graduated according to the individual motor club

company's ability to pay. Yet with even such a tax before it, and in answer to a contention almost identical with the one here made, the Supreme Court of California said: "[The plaintiff contends] that the cash or bond deposit prescribed is excessive and that it is illegal because the requirement is imposed on all alike without any inquiry into the size of the company or the possible extent of its financial liabilities. The power to impose this requirement in a proper case is not questioned. [Cases cited.] The specific inquiry, outside of any showing that the exercise of the power is arbitrary or unreasonable, is one of economics for the Legislature and not subject to review. Central Lumber Co. v. South Dakota, 226 U. S. 157, 161, 33 S. Ct. 66, 57 L. Ed. 164. However, in passing, we note that the facts alleged in the complaint show that the deposit required does not seem to be disproportionate to the present size and the possibilities in growth of the plaintiff's membership and its possible financial liabilities. No contention is made that the deposit required, compared to the regulations to insure financial responsibility on the part of insurance companies, is disproportionate, unreasonable, or arbitrary."

See, also, City and County of Sacramento v. Crocker, supra, and Old Homestead Bakery, Inc., v. Marsh, 75 Cal. App. 247, 252, 264–265, 242 P. 749, petition for hearing denied by the Supreme Court.

Here again the doctrine in California accords with general law. In Monamotor Oil Co. v. Johnson, 292 U. S. 86, 96, 54 S. Ct. 575, 579, 78 L. Ed. 1141, decided on April 2, 1934, Mr. Justice Roberts observed that "the appellant is not in a position to complain of any alleged discrimination arising from the terms of the statute, since it has not sustained injury and none is threatened which can affect it."

The appellant urges another ground for its charges that the tax in question is discriminatory. Pointing out that "the purpose of the tax" is "to maintain, repair and reconstruct highways" in the state, the appellant asserts: "The classification of distributors of gasoline, therefore, is not a reasonable one, inasmuch as it casts the burden on a portion of the persons affected or benefited by the maintenance and constructions of roads. The burden should fall on the users of the highway, not upon a part only of such users. The distributors of tires; the distributors of batteries, the fuel of electric-driven cars; *the distributors of feed for horse-drawn vehicles, etc.,* are not so taxed." [Italics our own.]

At least one California tribunal has already adequately disposed of a similar contention. In the Old Homestead Bakery Case, supra, at pages 264, 265 of 75 Cal. App., 242 P. 749, 755, the court said:

"Nothing could be clearer than that the automatic segregation by the acts in question of the persons operating fuel gas motor vehicles employed in the transportation of passengers for hire or the transportation of property and electric motor vehicles likewise used for the purpose of fixing a tax charge peculiarly appropriate to the character of such motor vehicles with respect to the means by which they are propelled, into different classes, involves a classification founded upon an intrinsic distinction arising from the essential difference in the agencies by which such motor vehicles are operated. The classification is as well grounded as is the classification made by one of the acts herein concerned as between electric motor vehicles used in the business of transporting passengers for hire or of property and electric motor vehicles used for other purposes, of which classification counsel for petitioner, as seen, voluntarily vouchsafe their approval. Indeed, the distinction upon which the classification herein is based is no less intrinsic or natural than that which exists or would exist as between those persons conducting a trucking or a freight or passenger business by means of motor vehicles fed with fuel gas or by electricity *and those operating trucks or passenger stages solely by the aid of horses or mules.* All persons belonging to either of the classes thus established stand in precisely the same relation to the law with respect to the burdens it imposes. There is, in other words, no discrimination as between any of the persons belonging to either class. All in each class stand upon an absolute equality in so far as are concerned the duties enjoined or the burdens imposed by the law.

"Concluding the discussion, it is pertinent to observe that other states have adopted such a plan of classification for the imposition of a *privilege tax* upon those using the public highways by means of motor vehicles as the acts in question have established in California, and that, although attacked in the higher courts of such states upon every conceivable constitutional ground, the plan has been upheld. Among the sister states referred to are Ohio, Massachusetts, Pennsylvania, and Maryland. In

the case of Graves v. Janes, 2 Ohio App. 383, decided in February, 1914, the court, dealing with a statute which in principle makes such a classification as is involved in the acts in question here, used the following language, which is cogently pertinent in all respects to the case in hand:

" 'The uniformity clause of the Constitution does not prevent reasonable classification of the subjects of legislation. Motor vehicles are a just subject of classification in respect to the use of public highways *as distinguished from horse-drawn vehicles.* * * * This classification deals more especially with the necessity of police regulation. The burden of highway maintenance as between motor vehicles, and horse-drawn vehicles is as clearly pronounced.' " (Italics our own.)

In the foregoing decision, the court was considering the constitutionality of the Motor Vehicle Act of 1923 (St. 1923, p. 517), the purpose of which, as in the instant case, was "to raise funds with which * * * highways may be improved and kept in repair in such manner as is suitable to the mode of transportation peculiar to motor vehicles." The case is therefore directly in point.

In San Francisco Shopping News Co. v. City of South San Francisco, 69 F.(2d) 879, 887, 888, certiorari denied October 22, 1934, 55 S. Ct. 122, 79 L. Ed. ——, we quoted and cited a large number of decisions of the United States Supreme Court to sustain the proposition that "the great latitude allowed to the Legislature in the exercise of its police power as well as its taxing power, with respect to necessity for regulation, reasonableness of classification, and the like, has been * * * frequently recognized by the Supreme Court." We need not here repeat those quotations and citations.

The appellant quotes from two decisions to support his contention that the taxing acts in question are discriminatory. The first is Ex parte Richardson, 170 Cal. 68, 148 P. 213, 214, 215, involving the validity of an ordinance entitled, "Imposing a license on nickel-in-the-slot machines." The Supreme Court of California found that section 2 of the ordinance, imposing a tax upon "such vendors of small articles of merchandise as use such a machine in making their sales and deliveries as is described therein," could not "be upheld as a valid enactment." The court said: "But, and we are now speaking solely of revenue taxes, we know of no principle that warrants the imposition of a tax on *some* of those engaged in a certain business, solely because of the method they use in making their sales and deliveries, and the exemption of all engaged in *the very same business* who do not use that method." (Italics our own.)

Can it be argued that gasoline dealers and feed distributors are in "the very same business," and that the taxing acts now under consideration discriminate against the former "solely because of the method they use in making their sales and deliveries"? Furthermore, the court at once proceeded to distinguish the situation that it was there considering from facts such as we have here: "We are speaking, of course, of methods not involving any occupancy or use of public property, such, for instance, as the use by wagons of a public highway."

The other case relied upon by the appellant on the subject of discrimination is Little v. Tanner (D. C. Wash.) 208 F. 605. In that case, the court held that a statute imposing a license tax of $6,000 a year upon any merchant using trading stamps violated the equality clause of the Federal Constitution (Amendment 14), inasmuch as such a law singled out for taxation a legitimate *system* of advertising to the exclusion of other systems. The case has no pertinency to the problem we are here considering. Furthermore, counsel for neither side seem to have noticed that Little v. Tanner was reversed by the Supreme Court 240 U. S. 369, 380, 381, 36 S. Ct. 379, 60 L. Ed. 691, on precisely the point of the "charge of discrimination" urged "against the statute."

Accordingly, we find no unconstitutional discrimination in either of these taxing statutes.

The final attack made by the appellant upon the constitutionality of the tax in question is based upon the ground that it does "not afford due process of law to the parties affected thereby," in that "there is nowhere within the acts a provision allowing the distributor a hearing on the matter of refunds or any dispute which might arise."

The text of Act 2964 does not bear out the appellant's assertion. As we have seen, the statute contains elaborate provisions for "collection of tax if delinquent," "seizure of property," *"notice of intended sale," "sale in accordance with law,"* "forfeiture of bond or deposit," "proceedings if tax not paid," with citation of the distributor to appear before the state board of equalization, etc.

It is fundamental law that "due process" in tax matters does not mean "judicial process." In the early case of Lent v. Tillson, 72 Cal. 404, 413, 414, 14 P. 71, 74, affirmed, 140 U. S. 316, 327, 328, 11 S. Ct. 825, 35 L. Ed. 419, the Supreme Court of California said:

"It has been repeatedly held that proceedings for the levy and collection of taxes are not necessarily judicial, and that due process of law, as applied to such matters, does not require such notice as is considered essential to the validity of a judgment. In Kentucky Railroad Tax Cases, 115 U. S. 331, 6 S. Ct. 571 [29 L. Ed. 414], it is said:

" 'Notice by statute is generally the only notice given, and that has been held sufficient. "In judging what is due process of law," said Justice Bradley in Davidson v. New Orleans, 96 U. S. 97 [24 L. Ed. 616], "respect must be had to the cause and object of the taking, whether under the taxing power, the power of eminent domain, or the power of assessment for local improvements, or none of these; and, if found to be suitable or admissible in the special case, it will be adjudged to be due process of law; but if found to be arbitrary, oppressive, and unjust it may be declared to be not due process of law." '

"In other words, the sufficiency of the notice must be determined in each case from the particular circumstances of the case in hand. And further, in matters of assessment and taxation, the same character of notice is not required as in ordinary actions in a court of justice; for the reason, I presume, that in such summary proceedings it is not practicable or usual."

See, also, Wulzen v. Board of Supervisors, 101 Cal. 15, 18-20, 35 P. 353, 40 Am. St. Rep. 17; In re Sutter-Butte By-Pass Assess. No. 6, 191 Cal. 650, 668, 669, 218 P. 27; 24 Cal. Jur., § 38, pages 58, 59.

This court so interpreted the phrase "due process of law" with reference to taxation matters, in Nevada National Bank of San Francisco v. Dodge, 119 F. 57, 62, 63, where the following language was used:

"3. The appellant also contends that the statute under which its shares were assessed is void, in that it does not provide for notice to the stockholders of the proceeding by which the assessment of their shares is to be made, and does not give to them an opportunity to be heard in relation thereto. Section 3610 of the Political Code [of California] provides that:

" 'The assessor charged by law with the assessment of said shares shall, within ten days after he has made such assessment, give written notice to each national banking association of such assessment of the shares of its respective shareholders; and no personal or other notice to such shareholders of such assessment shall be necessary for the purpose of this act.'

"We are unable to assent to the proposition that the notice thus provided for is insufficient, when considered in connection with other sections of the Political Code of the state (sections 3672–3682), which provide for a board of equalization, with power to hear complaints respecting the justice of any assessment, and also prescribe the time and place when and where such complaints may be heard. The shares of national banking associations are assessed under a general law, of which the stockholders must take notice; and the time and place when and where a stockholder may appear for the purpose of applying for a reduction of the valuation placed upon his property is fixed by a general law, of which he must also take notice. This is, we think, under all of the authorities, sufficient notice of proceedings for the assessment and taxation of property. In the language of the supreme court in Palmer v. McMahon, 133 U. S. 669, 10 S. Ct. 324, 33 L. Ed. 772:

" 'The power to tax belongs exclusively to the legislative branch of the government; and when the law provides for a mode of confirming or contesting the charge imposed, with such notice to the person as is appropriate to the nature of the case, the assessment cannot be said to deprive the owner of his property without due process of law.'

"And in Kentucky Railroad Tax Cases, 115 U. S. 321, 6 S. Ct. 57, 29 L. Ed. 414, it was said:

" 'It has, however, been repeatedly decided by this court that the proceedings to raise the public revenue by levying and collecting taxes are not necessarily judicial, and that "due process of law," as applied to that subject, does not imply or require the right to such notice and hearing as are considered to be essential to the validity of the proceedings and judgments of judicial tribunals. Notice by statute is generally the only notice given, and that has been held sufficient.' "

A study of the statutes in question convinces us that, in the matter of due process,

they fully meet the standards laid down in the foregoing decisions.

It might be well to conclude our discussion of the constitutionality of these statutes, with the closing language of our opinion in the Shopping News Case, supra: "In conclusion, we desire to advert to the salutary reluctance displayed by the courts—especially, as we have seen,·by the federal courts—with regard to declaring unconstitutional an enactment of the lawmaking body of a state or of any of its agencies or subdivisions. That reluctance we share."

We press on. to a consideration of the appellant's final contention; namely, that "even though the acts are held to be valid and constitutional, nevertheless they do not create a lien upon the property. of the distributor, and therefore do not entitle the State to any priority over general creditors." We are assuming herein that the question of the priority of the state's tax liens over *antecedent liens* is not involved.

■ Under this heading, the appellant's first objection is that "the lien attempted to be created is indefinite; uncertain, and contradictory," "in that, in one part of said paragraph 4, it is provided that the tax shall be a lien upon all property of the distributor; while further on, in said paragraph, it is provided that the Controller shall seize any property, real or personal, used by the distributor in the operation of his business, thereby limiting the lien to property used by the distributor in the operation of his business rather than all of the property of the distributor as theretofore provided."

In other words, the appellant seems to complain that, though the lien is created upon *all* of the distributor's property, the statute provides for the enforcement of only such part of the lien as may be attached to the distributor's *business* property. We cannot see how the appellant is harmed by such a provision; for, accepting the appellant's interpretation of section 4, we find that the controller is permitted to exercise his lien upon *less,* and not *more,* of the property originally covered thereby. Furthermore, the record here contains no suggestion that, in the *instant* case, any attempt was being made improperly to subject *any* of the appellant's property to the statutory lien.

■ Again, the appellant objects that "it further cannot be ascertained whether the property used by the distributor in the op-

eration of his business be deemed the property as it existed at the time of the particular sale or distribution, or whether it be the property used by the distributor at the time of the seizure." Here, again, the record is absolutely silent as to there having been any change in the quantum or identity of the distributor's property since the lien attached. The appellant therefore raises a moot question; and, in the words of the Supreme Court, he "is not in a position to complain." Whatever might be the ambiguities that *might* arise under the statutes, no such practical question is here presented, and none should therefore be considered.

■ Next, the appellant asserts that "one of the essential elements of a lien on personal property is that of the right of possession," but "that we have the situation of a lien without the right of possession to personal property being fixed at a time when the tax is not yet payable."

In support of this objection, the appellant quotes from Lineker v. Ayeshford, 1 Cal. 75, 80, decided more than three-quarters of a century before the statute in question was enacted; and from 17 Ruling Case Law, § 9, pages 601, 602.

The latter quotation, we believe, discloses the appellant's evident misconception of the nature of a statutory lien:

"It is indispensable to the existence of a *common law* lien that the party who claims it should have an independent and exclusive possession of the property, the right to the lien being based directly upon the idea of possession. * * *" (Italics our own.)

Statutory liens do *not* depend upon possession for their validity. In Duncan v. Hawn, 104 Cal. 10, 13, 14, 37 P. 626, 627, the court said:

"The conflict upon the subject has doubtless largely arisen from a failure to distinguish between common-law liens, to the existence of which possession, actual or constructive, is necessary, and those liens of purely statutory origin which had no existence at common law. * * *

"Liens which are not merely declaratory of the common law do not require possession to support them. They have the same operation without possession, and the same efficacy as common-law liens have with possession, and the assignment of the claim carries with it the right to the lien."

The Political Code of California specifically creates and recognizes tax liens. Section 3716 provides: "*Tax Liens. Every*

tax has the effect of a judgment against the person, and every lien created by this title has the force and effect of an execution duly levied against all property of the delinquent; the judgment is not satisfied nor the lien removed until the taxes are paid or the property sold for the payment thereof. * * *"

Section 3717 reads as follows: *"Tax on Personal Property a Lien on Real Property.* Every tax due upon personal property is a lien upon the real property of the owner thereof, from and after twelve o'clock m. of the first Monday in March in each year."

And section 3718:

*"Liens of Taxes on Real Property and Taxes on Improvements.* Every tax due upon real property is a lien against the property assessed; and every tax due upon improvements upon real estate assessed to others than the owner of the real estate, is a lien upon the land and improvements; and the taxes on all assessments of possession of, claim to, or right to the possession of land, and the taxes on taxable improvements located upon land exempt from taxation, are respectively liens upon such taxable real property, if any, as the owner or claimant of such possession of, claim to or right to possession, or improvements, owns in the county in which such possession, claim to, or right to possession of land, or taxable improvements are situated; which several liens attach as of the first Monday of March in each year."

Section 3785b of the same compilation declares that the provisions of sections 3786 and 3787 of the Code shall be made applicable to the deed provided for in section 3785b; namely, a deed "to a purchaser other than the state of California at a delinquent tax sale." Section 3787 reads as follows: *"Effect of Deed to State.* Such deed, duly acknowledged or proved, is (except as against actual fraud) conclusive evidence of the regularity of all other proceedings, from the assessment of the assessor, inclusive, up to the execution of the deed. Such deed conveys to the state the absolute title to the property described therein, free of all encumbrances, except any lien for taxes levied for municipal * * * purposes," etc.

Having before it Code provisions similar to those now found in sections 3716, 3717, 3785b, and 3787, the Supreme Court of California, in the case of California Loan Co. v. Weis, 118 Cal. 489, 494, 50 P. 697, 699, said: "No distinction is made by these laws between the lien which exists upon the land for the tax on personalty and the lien which exists for the tax upon the land itself. 'Every lien' created by this title remains until the taxes are paid or the property sold. The title which the purchaser gets under the enforcement of any tax lien by sale is free from all incumbrances. 'A lien for taxes does not stand upon the footing of an ordinary incumbrance, and is not displaced by a sale under a pre-existing judgment or decree, unless otherwise directed by statute. It attaches to the res, without regard to identical ownership, and when it is enforced by sale pursuant to statute the purchaser takes a valid and unimpeachable title.' Osterberg v. Union Trust Co., 93 U. S. 424 [23 L. Ed. 964]. The mandate of our statutes puts all tax liens upon the same plane, *makes them all paramount to other liens, and, under sale for their enforcement, gives to the purchaser a title free and unincumbered."* (Italics our own.)

Furthermore, as the appellee points out, "the State of California, by its adoption of the common law, has succeeded to the prerogative right of the British Crown to priority in payment for taxes out of the assets of insolvent debtors, as against all persons not having antecedent liens."

Section 4468 of the Political Code provides: *"Common Law When Rule of Decision.* The common law of England, so far as it is not repugnant to or inconsistent with the constitution of the United States, or the constitution or laws of this state, is the rule of decision in all the courts of this state."

Marshall v. New York, 254 U. S. 380, 382–385, 41 S. Ct. 143, 144, 65 L. Ed. 315, involved, not a franchise tax, as contended by the appellant herein, but "license fees or taxes for the privilege of doing business within the state." The propriety of allowing to the state a preference as to amounts due for the annual *franchise* taxes, also owned by the corporation, was admitted by the receiver in that case. The lien for *license* taxes alone was in question. The Supreme Court said:

"The single question is presented whether the state of New York has priority in payment out of the general assets of the debtor over other creditors whose claims are not secured by act of the parties nor accorded a preference, by reason of their nature, by the state Legislature or otherwise.

"At common law the crown of Great Britain, by virtue of a prerogative right, had priority over all subjects for the payment out of a debtor's property of all debts due

it. The priority was effective alike whether the property remained in the hands of the debtor, or had been placed in the possession of a third person, or was in custodia legis. The priority could be defeated or postponed only through the passing of title to the debtor's property, absolutely or by way of lien, before the sovereign sought to enforce his right. * * *

"This priority arose and exists independently of any statute. The Legislature has never, in terms, limited its scope; and the courts have rejected as unsound every contention made that some statute before them for construction had, by implication, effected a repeal or abridgment of the priority. The only changes of the right made by statute have been by way of enlarging its scope in certain cases. * * *

"The priority of the state extends to all property of the debtor within its borders, whether the debtor be a resident or nonresident and whether the property be in his possession or in custodia legis. The priority is therefore enforceable against the property in the hands of a receiver appointed by a federal court within the state."

The appellant seeks to distinguish the Marshall decision from the case at bar, on the ground that "the State of California has not adopted that rule [that 'claims of the state and taxes are preferred as to payment'] but, on the contrary, the law is and the courts of this state have, contrary to the courts of New York state repeatedly, consistently and uniformly held that every levy of tax is in invitum," etc. A study of the California statutes and of the California Loan Case, supra, however, will convince one that the appellant is in error, and that the law of California clearly recognizes the priority of the state's liens for taxes.

See, also, Chase v. Trout, 146 Cal. 350, 365, 80 P. 81 (street assessment lien's priority over *antecedent liens* of a private nature); Liberty Mut. Ins. Co. v. Johnson Shipyards Corp. (C. C. A. 2) 6 F.(2d) 752, 754, 756–758, affirmed Stripe v. United States, 269 U. S. 503, 46 S. Ct. 182, 70 L. Ed. 379.

The appellant seeks to weaken the authority of the Liberty Mutual Insurance Case, supra, by quoting a passage therefrom to the effect that "the right of the *United States* to priority in the payment of *debts* depends exclusively upon *statute.*" (Italics our own.) But the appellant omits no doubt, inadvertently, the following significant passages from the opinion, which at once bring it within the situation with which we are now dealing:

"It has frequently been pointed out that a tax lawfully imposed is not to be regarded as an ordinary *debt,* but is an obligation which is to be regarded as paramount to all other demands, although the law imposing the tax does not expressly provide that it is to have priority. * * *

"The courts have sustained in numerous cases the right to priority of payment of taxes over all other claims. [Many cases cited.] But these cases relate to the right of a *state* to priority of payment of a *state* tax, which is to be distinguished from the right of the United States to a similar priority, possibly in the fact that *the states have a common law* while it has often been said by the Supreme Court that the United States has no common law.

"However, instances are numerous in which the common-law prerogatives of the sovereign have been held applicable to the United States in its sovereign capacity. * * *

"And we think that, *independently of any specific statutory provision, the United States in its capacity as a sovereign is entitled to a priority in the payment of taxes over unsecured creditors; such priority being possessed by it as a prerogative right.*" (Italics our own.)

Thus it will be seen that, in the foregoing case, the court distinguished between ordinary debts and taxes, and held that not only the states, but the United States, was entitled to priority in the payment of taxes over unsecured creditors, such priority being possessed by it as a prerogative right. The case is therefore clearly authority here, where the prerogative, not of the United States, but of a state, is involved.

To recapitulate, we find that the taxing statutes in question violate neither the Federal nor the State Constitution; that they have created valid liens in favor of the appellee; and that such liens are entitled to priority over the claims of the general unsecured creditors of the receivership estate.

Accordingly, the judgment is affirmed.